826 P.2d 783

**STATE of Arizona, Appellee,**

v.

**John George BREWER, Appellant.**

**Nos. CR–88–0308–AP, CR–89–0319–T/AP.**

Supreme Court of Arizona,
En Banc.

Jan. 28, 1992.
Reconsideration Denied April 8, 1992.

Grant Woods, Atty. Gen. by Jessica Gifford Funkhouser, Former Chief Counsel, Crim. Div., Paul J. McMurdie, Asst. Atty. Gen., Phoenix, and John Verkamp, Coconino County Atty. by A. Fred Newton, Deputy County Atty., Flagstaff, for State.

Kathleen A. Kelly, Phoenix, for appellant.

John R. Hannah, Tempe, for amicus curiae Ariz. Capital Representation Project.

## OPINION

CORCORAN, Justice.

Appellant John George Brewer (defendant) pleaded guilty to the first-degree murder of his girlfriend (victim) and was sentenced to death. This automatic appeal followed. *See* A.R.S. § 13–4033; rules 26.-15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure.

The State filed its own appeal in the court of appeals, challenging the trial court's dismissal of the first-degree murder charge for the death of the victim's 22–week–old, unborn fetus. We transferred the State's renumbered appeal to this court and consolidated it with defendant's automatic appeal. *See* rule 31.4(b), Arizona Rules of Criminal Procedure.

For the reasons stated below, we affirm the trial court's judgment of conviction upon a plea of guilty and the sentence of death. We also affirm the trial court's dismissal of the first-degree murder charge for the death of the fetus. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033.

## ISSUES PRESENTED

In the case involving the victim's death, papers were filed by defendant, the State, and the Arizona Capital Representation Project,[1] which had obtained permission to participate as *amicus curiae.* Collectively, the briefs raise the following issues:

1. Did defendant limit this court's jurisdiction to review his conviction and sentence of death by attempting to waive all mandatory and discretionary appeals?

2. Did the trial court abuse its discretion in determining that defendant was competent to plead guilty?

3. Was defendant denied effective assistance of counsel?

4. Does Arizona's death penalty statute violate the eighth and fourteenth amendments by precluding the trial court from considering all relevant, mitigating circumstances and presuming death to be the appropriate sentence?

5. Does Arizona's death penalty statute violate the sixth and fourteenth amendments by removing from the jury the determination of the factual elements of capital murder?

6. Did the trial court err in finding that the fetus was a person for purposes of determining the aggravating factor of creating a grave risk of death to another person in addition to the victim of the offense?

7. Is the aggravating factor of "especially heinous, cruel or depraved" unconstitutionally vague on its face?

8. Did the trial court err by concluding that defendant murdered the victim in an "especially heinous, cruel or depraved" manner?

9. Did the trial court violate the confrontation clause, the due process clause, and the Arizona statutes by relying on inadmissible evidence to support its findings of aggravating circumstances?

10. Did the trial court err by finding that the mitigating factors did not sufficiently outweigh the aggravating factors to require leniency?

---

1. The Arizona Capital Representation Project is a non-profit organization that provides legal assistance to defendants in death penalty cases. It is located at, but is not affiliated with, Arizona State University College of Law.

11. Did the trial court improperly consider victim impact evidence from the presentence report and the testimony of police officers in determining the appropriate sentence?

12. Was the trial court bound by the prosecutor's recommendation of a life sentence, despite the State's submission of evidence proving the existence of aggravating factors?

13. Is defendant's death sentence proportionate to sentences imposed in similar cases?

We also note the following issues raised in the State's separate appeal from the trial court's order dismissing the charge of first-degree murder of the unborn fetus:

14. Does A.R.S. § 13–1103(A)(5) preclude the State from prosecuting defendant for the death of the unborn child under the State's homicide statutes?

15. Was the 22–week–old unborn fetus a human being for the purposes of A.R.S. § 13–1101(3)?

We will address those issues necessary to our decision, but not necessarily in the order set forth above.

## FACTS AND PROCEDURAL HISTORY

In 1987, defendant lived in an apartment in Flagstaff, Arizona with his pregnant girlfriend and her roommate. On November 11 of that year, sometime between midnight and 5:00 a.m., defendant became upset during an argument with the two women about his dependency on his mother. The argument was precipitated by a telephone conversation between defendant and his mother that had left him feeling very depressed. When pestered to reveal his plans if his girlfriend were to die, defendant left in tears to cry in an adjoining room. After gaining his composure, defendant "patch[ed] things together" [2] with his girlfriend and the couple proceeded to bed around 5:30 a.m.

Defendant woke up at 11:15 a.m. and reminded the roommate that she needed to go to work, which she did. He then went back to sleep with his girlfriend. The couple got out of bed at approximately 1:30 p.m. and continued their discussion from the previous night. At some point in the exchange, the girlfriend told defendant she loved him and, because she did, she would leave him so that he could prove he could live by himself. Enraged by this statement, defendant locked the roommate's dog in another room and screamed, "Why think about if you were dead, I'll kill you." Defendant then attacked his girlfriend, and a violent, 30– to 45–minute struggle ensued.

Defendant tried to strangle his girlfriend with his bare hands, but she put up violent resistance, grabbing for his testicles, eyes, and ears. She almost escaped on several occasions, but defendant pulled her back to the floor each time and continued beating her body against "whatever [he] could find" to diminish her ability to resist. Defendant also bent her fingers back and pushed his thumbs into her eyes in an attempt to dislodge the eyeballs. The girlfriend managed to yell that if he killed her he would go to jail, but he replied, "So what? At least you would be dead!" Eventually, defendant found a necktie, wrapped it around the girlfriend's neck, and repeatedly strangled her. Twice defendant believed his girlfriend was dead, but she began to breathe when the necktie was removed. The victim finally succumbed after the third strangulation.

Defendant undressed, threw his clothes on the victim, took a shower and, according to his statements to the police, proceeded to have sexual intercourse with the corpse. After checking the victim's pupils for signs of life, he telephoned 911 and claimed to have witnessed a man assaulting a woman. When the 911 dispatcher pressed for further details, defendant admitted that he had beat and strangled the victim to death. Officers from the Flagstaff Police Department responded to the 911 call and took defendant into custody. The police read defendant his *Miranda* rights, which he waived. In response to police inquiries, defendant confessed once again to the crime. Defendant was then transported to

---

**2.** Quotations in this summary of facts are taken from defendant's confession.

the police station where he made a hand-typed confession.

Physical evidence at the scene of the murder corroborated defendant's story. The police found the victim's badly beaten body lying on the floor of the apartment with her pants and underwear rolled up near her head. They also found the dog locked in an adjoining room and noticed scratch marks around defendant's eyes. The victim's autopsy verified a myriad of contusions, abrasions, and lesions covering a large portion of the victim's body, including severe swelling and hemorrhages on the scalp and in the eyes, and bite marks on the right hand, right arm, and upper part of the right breast. Medical examiners described the victim's face as profusely swollen, and impressions from manual and multiple ligature strangulation were found on the victim's neck.

A grand jury issued two separate indictments charging defendant with first-degree murder for the death of the victim and the resulting death of the unborn fetus. The trial court consolidated the two indictments and granted defendant's motion to dismiss the first-degree murder charge for the death of the unborn child. After conducting an evidentiary change of plea hearing and finding a sufficient factual basis to support the charge of first-degree murder of the victim, the trial court accepted defendant's plea of guilty and ordered defense counsel to present mitigating evidence at the presentencing hearing.

Defendant was subsequently sentenced to death and an automatic appeal was filed on his behalf pursuant to rule 31.2(b), Arizona Rules of Criminal Procedure. The State filed a separate appeal with the court

of appeals seeking reversal of the trial court's order dismissing the charge for the death of the fetus. That appeal was transferred to this court and consolidated with defendant's appeal.

## DISCUSSION

### I. *Defendant's Motion to Dismiss the Mandatory Appeal*

■ Throughout these proceedings, defendant has voiced his support for the state's death penalty statute and expressed his belief that he should be executed for the confessed crimes. On account of these views, defendant sent a letter to the clerk of this court requesting that he be allowed to abandon all appeals. We treated the letter as a motion to dismiss his mandatory appeal and ordered the parties to brief the bases for compelling defendant to maintain an appeal. Reasoning that a defendant's power voluntarily to dismiss an appeal does not apply to the mandatory appeal filed in capital cases, *see* rules 26.15 and 31.2(b), Arizona Rules of Criminal Procedure, we denied defendant's motion. *See also* A.R.S. § 13–4031 (appeals in death cases may be filed only with the supreme court and are prescribed by the rules of criminal procedure); rule 31.15(a)(3), Arizona Rules of Criminal Procedure (power to dismiss an appeal by stipulation of the parties does not apply to rule 31.2(b) appeals).[3]

The State now argues that, even though the automatic appeal under rule 31.2(b) may not be voluntarily dismissed, defendant's waiver nevertheless limits this court's jurisdiction and scope of review. Because defendant waived all discretionary issues, this court has jurisdiction to review only those matters that are authorized un-

---

3. We note that at least 22 states' "statutes or rules employ language indicating that their appellate courts must review at least the sentence in every capital case." *Whitmore v. Arkansas,* 495 U.S. 149, 174 n. 1, 110 S.Ct. 1717, 1733 n. 1, 109 L.Ed.2d 135 (1990) (Marshall, J., and Brennan, J., dissenting) (listing state statutes and rules, including rules in Arizona). Our research also reveals no cases in which a defendant was permitted to waive a *mandatory* appeal.

Gary Gilmore was executed in Utah without any state appellate review, but Utah at that time did not provide for mandatory, nonwaivable

appellate review. *See [Bessie] Gilmore v. Utah,* 429 U.S. 1012, 1014–17, 97 S.Ct. 436, 438–39, 50 L.Ed.2d 632 (1976) (court declines jurisdiction over application for stay of execution filed by Gary Gilmore's mother over his objection). Similarly, in *Whitmore,* the United States Supreme Court permitted a defendant to waive his appeal in a capital case, *Whitmore,* 495 U.S. at 153–154, 110 S.Ct. at 1722, but Arkansas statutes do not provide for automatic appeal of death sentences, *Franz v. State,* 296 Ark. 181, 196–97, 754 S.W.2d 839, 847 (1988) (Glaze, J., concurring and dissenting).

der the statutes. Section 13–4035(A) states that "the supreme court shall review all rulings affecting the judgment," but the statute places no corresponding duty or authority on this court to review sentences. The State insists, therefore, that we may review this case for fundamental error only as it applies to the judgment of guilt and not the sentence of death.

▪ The State's argument, however, minimizes our statutorily prescribed powers of review and, if accepted, would defeat the obvious purpose of requiring mandatory appeals in capital cases, which is to insure that the death *sentence* is properly and constitutionally applied. As we read the statutes and the cases interpreting them, this court has a duty, wholly apart from our obligation to review the judgment for errors, to review the validity and propriety of all *death* sentences. Section 13–4035, for instance, is not so much jurisdictional in nature as it is relevant to our scope of review, requiring us to search the entire record for fundamental error "when a defendant appeals from a judgment, regardless of the grounds urged in that appeal." *State v. Dawson,* 164 Ariz. 278, 283, 792 P.2d 741, 746 (1990). We find nothing in § 13–4035 or any of the statutes that relate to jurisdictional authority, *see* A.R.S. §§ 13–4031 through –4033, indicating that the legislature intended to suspend our review of death sentences in cases in which the defendant attempts to waive his mandatory appeal.[4]

▪ If anything, we believe, as we did in *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), that "[t]he legislature charged this court with the duty to correct [death] sentences which are illegal and sentences where we find that the punishment imposed is greater than the circumstances of the case warrant." In *Richmond,* this view was premised on language from former A.R.S. § 13–1717, now codified at § 13–4037(A), which instructs in part,

Upon an appeal by the defendant either from a judgment of conviction or from sentence, if an illegal sentence has been imposed upon a lawful verdict or finding of guilty by the trial court, the supreme court shall correct the sentence to correspond to the verdict or finding.

Thus, once a defendant files an appeal, which is automatic in capital cases, we are expressly required by statute to review issues affecting *both* judgment and sentencing in our search for fundamental error. *See, e.g., State v. Smith,* 136 Ariz. 273, 279, 665 P.2d 995, 1001 (1983) (finding of ineffective assistance of counsel at sentencing considered part of the court's "fundamental error" review).

▪ Appellate review of sentencing is, of course, even more necessary in the context of a capital case. The penalty of death differs from all other forms of criminal punishment in terms of severity and irrevocability, and may not be exacted in the absence of certain constitutional safeguards. *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931–32, 49 L.Ed.2d 859 (1976) (Stewart, J., announcing judgment of the court, and opinion of Stewart, J., Powell, J., and Stevens, J.). That is, the eighth and fourteenth amendments prohibit all sentencing procedures creating a substantial risk that the death penalty is inflicted in an arbitrary and capricious manner. *Gregg,* 428 U.S. at 188, 96 S.Ct. at 2932.

▪ We have long held, therefore, that we are bound by the gravity of the death penalty to insure proper compliance with Arizona's death penalty statute. *Richmond,* 114 Ariz. at 196, 560 P.2d at 51; *State v. Vickers,* 129 Ariz. 506, 514, 633 P.2d 315, 323 (1981). We cannot fulfill this duty by simply inspecting defendant's first-degree murder conviction for fundamental error. We must also conduct a *de novo* review of the trial court's rulings concerning aggravation and mitigation, and then

---

**4.** Contrary to the State's assertions, *Dawson* does not speak to the issue of whether defendant may waive his mandatory appeal or restrict our scope of appellate review by attempting to do so. *Dawson* merely held that our power to correct an illegally lenient sentence is predicated upon an appeal filed by the *State. Dawson,* 164 Ariz. at 286, 792 P.2d at 749. The issue here pertains to our review of the *mandatory* appeal from a death sentence filed on behalf of the defendant pursuant to rule 31.2(b).

decide independently whether the death sentence should be imposed. *State v. Gretzler*, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983).

The automatic appeal mechanism guarantees this court both the opportunity and the vehicle to assess the legality of the sentence in each capital case. *See* rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure (rules requiring mandatory appeal to the supreme court in all death sentence cases); comment to rule 31.15 (specific purpose of rule 31.15(a)(3) is "to avoid circumvention of the automatic appeal"); A.R.S. § 13–703(D) (trial court must set forth findings on existence or nonexistence of aggravating and mitigating factors in a special verdict); A.R.S. § 13–4031 (sentence of death may only be appealed to the supreme court). If the record reveals that the trial court, for whatever reason, improperly sentenced a defendant to death, we must overturn that sentence. Our duty and ability to do so is neither diminished nor destroyed by the simple fact that a defendant desires to waive his right to appeal.

In short, the State's attempt to curtail the scope of our review must be rejected for the very reason we denied defendant's motion to dismiss this appeal—the propriety of the death penalty is not for the defendant or the trial court alone to decide. That decision rests also with this court upon automatic appeal and is guided, above all, by the state's narrowly construed statutes specifying the limited circumstances for which a defendant may be deemed death-eligible, *see* A.R.S. § 13–703, regardless of defendant's own death wish. Because we believe that acceptance of the State's position is tantamount to the renunciation of a duty imposed upon us by the statutes and our own rules of criminal procedure, we hold that defendant may neither circumvent nor restrict the mandatory appeal to this court provided for him pursuant to the state's capital-sentencing procedures.

## II. *Competency*

Before accepting defendant's guilty plea to first-degree, premeditated murder with no plea agreement limiting the sentence to life imprisonment, the trial court conducted a hearing to determine defendant's competency to change his plea to guilty against the advice of counsel. At the hearing, defense counsel, William B. Hurst, informed the court that he had reviewed the murder charge and related sentencing issues with defendant and had advised him not to plead guilty. Defendant was then thoroughly questioned by the court regarding his capacity to understand the charges against him, his rights, and the advice of his attorney. The court also asked defendant if he understood the consequences of waiving his rights and ignoring the advice of counsel, including the irrevocability of a plea that may result in the imposition of the death penalty. When defendant was questioned about his reasons for pleading guilty, the following exchange took place:

THE DEFENDANT: It is my honored belief that life sentence or death sentence is the proper punishment for a murderer.

THE COURT: But is it for you, sir. Do you understand that that may well be the punishment to you? We are not dealing in the abstract, we are dealing with you?

THE DEFENDANT: I killed her. I am very sorry I killed her. This court is fully aware that I have—that my entire run in with police is basically been two traffic violations.

Just because the sentence deals with me does not necessarily make it wrong. I feel it is right and if it's right for somebody else it's right for me.

THE COURT: What I am trying to get at, Mr. Brewer, is I want to make sure that you have a full understanding. I think you do. I've got to make sure for the record that you do have a full understanding that by entering into this admission you may well be subjecting yourself to the death penalty?

THE DEFENDANT: I have been informed by Mr. Hurst that he feels that I am a prime candidate, I believe was the word that he used, for the death sentence if I do enter a plea of guilty.

THE COURT: And you understand that?

THE DEFENDANT: Yes, I do, Your Honor.

At the end of the change of plea hearing, having been satisfied with defendant's answers throughout the entire proceeding, the trial court stated,

> On the basis of the record I find that the defendant knowingly, intelligently and voluntarily enters into a plea of guilty to the charge of First Degree Premeditated Murder. That there is a factual basis for it.
>
> I find that upon review of the psychological reports [by Michael B. Bayless, Ph.D., and Dean L. Gerstenberger, M.D.], the demeanor of the defendant, his responses to the court's inquiries, his full understanding of consequences of the sentencing options available to the court, and there being only two, Mr. Brewer. Further in light of his education he has versed himself fairly in legal procedures and he does understand the complexities of this case.
>
> Based upon all of the foregoing I hereby accept the plea of guilty.

Defense counsel now attacks the trial court's findings for the following reasons: (1) defendant suffers from a personality disorder causing severe detachment and depression, which in turn forces him to make decisions that seem opposite to what is best for him; (2) the court applied an incorrect legal standard to determine competency; and (3) the ruling contradicts the court's refusal to allow defendant to represent himself or to waive his right to present mitigating evidence at the presentencing hearing.

■ Preliminarily, our review is governed by an abuse of discretion standard. "[W]e look only to see whether reasonable evidence supports the trial court's finding" that defendant was competent to waive his rights and enter the plea. *State v. Bishop,* 162 Ariz. 103, 104, 781 P.2d 581, 582 (1989). We will also "consider the facts in a light most favorable to sustaining the trial court's finding." *Id.* A criminal defendant "is not competent to plead guilty if the mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and understand the nature of the consequences of his plea." 162 Ariz. at 105, 781 P.2d at 583, *quoting Sieling v. Eyman,* 478 F.2d 211, 215 (9th Cir.1973).

■ The principles just briefly assayed suggest no reason to disturb the trial court's ruling. Defendant is not the first, and likely not the last, person to plead guilty in a death penalty case.[5] We cannot say he is incompetent or prone to self-destructive impulses simply because he desires to do so.. *Cf. People v. Burnett,* 188 Cal.App.3d 1314, 1326, 234 Cal.Rptr. 67, 75 (1987) (courts must guard against the danger that a defendant's very wish to represent himself is itself treated as an indication that he may be mentally unfit); *see also Bishop,* 162 Ariz. at 107, 781 P.2d at 585 (defendant may have a "less visionary" view of the ability of the state's penal and mental health systems to provide humane, compassionate, and rehabilitative treatment). Indeed, the competency test under *Eyman* is not whether defendant acted in his own best interests, but whether he possessed the ability to make a reasoned choice and to understand the consequences of that decision. *Bishop,* 162 Ariz. at 108, 781 P.2d at 586. The trial court's ruling, though couched in terms different from the magic words used in *Eyman,* concluded that he did, and we agree.

■ Defendant attended 2½ years of college, suffers no learning disabilities, and achieved a full-scale intelligence quotient (I.Q.) of 132, a score that ranks him in the superior range of intellectual functioning. Aside from indicating that defendant suffers from a borderline personality disorder brought on by a troubled background and a dependency on his mother, the psy-

---

**5.** We mention only two of the many cases in which a defendant pleaded guilty and received the death penalty: *State v. Wallace,* 151 Ariz. 362, 364, 728 P.2d 232, 234 (1986); *State v. Smith,* 123 Ariz. 231, 234, 599 P.2d 187, 190 (1979).

chiatric reports filed earlier with the court[6] found no evidence of a mental defect or an erosion of mental capacity and concluded that defendant was competent to plead guilty. Specifically, Dr. Bayless stated in his report,

> Mr. Brewer is not suffering from any mental disease or defect that would render him incompetent. . . .
>
> . . . .
>
> As stated earlier, Mr. Brewer is definitely competent to stand trial and has the ability at this time to understand the nature of the proceedings against him, as well as, the ability to assist his attorney in the preparation of his own defense. Further, if Mr. Brewer chooses to plead guilty, he does have the ability to make a competent decision concerning the waiver of his rights, as well as, a rational and factual understanding of the consequences of entering a plea of guilty in a court of law.

Dr. Gerstenberger also concluded,

> Mr. Brewer is seen to be alert, well oriented, and cooperative. He has no evidence of delusional thinking and is not seen to have any signs of a thought disorder. . . . He understands the charges against him and also is aware of the possible outcome of the legal proceedings against him.
>
> . . . .
>
> He is competent to change his plea should he decide to do so.

The psychiatric experts disagreed as to whether defendant possessed suicidal tendencies. Under Arizona law, the trial judge was "not required to accept or reject [the] expert testimony in toto and [could] rely on [the] particular views of one or more experts" in making his competency ruling. *Bishop*, 162 Ariz. at 107, 781 P.2d at 585.

The course of inquiry at the change of plea hearing only confirmed what the experts reported. Defendant's responses reflected a solid knowledge of the charges and the law, as well as an understanding of his rights and the consequences of waiver.

Defendant also displayed normal communication skills and thought processes, and the record does not contain a scintilla of evidence that defendant was coerced into making the plea. We note in passing that we recently found a much less qualified defendant competent to plead guilty. *See Bishop*, 162 Ariz. at 104–05, 107–08, 781 P.2d at 582–83, 585–86 (defendant found competent to plead guilty even though he was physically impaired, mentally retarded (I.Q. of 77), emotionally labile, schizophrenic, and suffered from an organic brain dysfunction).

Based upon the foregoing, we find sufficient evidence to conclude that defendant's ability to make rational choices and to understand the attendant consequences was not substantially impaired at the time of the guilty plea. That the trial court failed to cite *verbatim* the test in *Eyman* does not mean that the wrong legal standard was applied. The court expressly found that defendant "knowingly, intelligently and voluntarily" entered into the plea and had a "full understanding of [the] consequences of the sentencing options available to the court." If a difference exists between the level of competency displayed by this defendant and the capacity to understand and make the reasoned choice described in *Eyman*, we are unaware of it.

Contrary to assertions by the defense, the other competency rulings in this case shed little light on our present determination of defendant's mental condition. Regarding the suggestion that defendant might want to proceed *pro se*, for example, the trial court remarked,

> I expect that you will consult with your attorney [Mr. Hurst] and at least listen to what he has to say. What you do with that information is, again, entirely up to you.
>
> You have been found competent to stand trial in these proceedings. It's a little different standard. It's a little higher standard to be competent to defend yourself. You are not competent to

---

**6.** In lieu of a rule 11 hearing, both parties stipulated that defendant's competency to stand trial and his mental condition at the time of the offense would be determined from reports filed with the court by two experts: Dr. Bayless and Dr. Gerstenberger.

defend yourself, as probably I would not be competent to defend myself.

There's an old adage which says the person who represents himself ... has a fool for a client. And you're in that same situation. You should not even attempt it.

The court's ruminations about the possibility of defendant waiving counsel were based on defendant's legal knowledge and wisdom, and not on his mental competency. The State concedes on appeal that "[t]he test to be applied in determining whether one is legally capable of waiving counsel ... is ... *not* one of legal skills." *State v. Martin*, 102 Ariz. 142, 146, 426 P.2d 639, 643 (1967) (emphasis in original) (footnote omitted).

In any event, the trial court did not need to comment on defendant's competency to waive assistance of counsel and represent himself. Notice that defendant desired to exercise such rights came from Dr. Bayless, who made a note to that effect in his report, and from a few of defendant's own letters mentioning displeasure with defense counsel. However, during the hearing to consider Mr. Hurst's motion to withdraw as defense counsel, which was ultimately denied, defendant recanted his wish to represent himself and informed the court that he no longer wanted "to not have an attorney." He simply wanted the court to grant defense counsel's motion to withdraw and appoint a new defense attorney, one that "would not make [him] feel [like] a criminal for trying to plead guilty." Although defendant desired a new attorney, he never made a formal request to proceed without one. The record suggests, therefore, that the waiver of counsel question was never an issue in this case.

Concerning the trial court's ruling requiring defense counsel to present evidence of mitigation, the court's minute entry does not recite any basis for the order, so we are

unable to ascertain whether, or by which standards, defendant's competency to waive mitigating evidence was assessed at that time. The record suggests the possibility that the court, believing it was required by public policy mandating informed sentencing to marshall mitigating evidence,[7] considered defendant's mental condition irrelevant to its decision.

Thus, to the extent the trial court's competency rulings seem incongruous, they do so only because the court may have suggested too stringent a standard in discussing the possible waiver of other rights, and not because it erred in finding defendant competent to plead guilty. Defendant was certainly not prejudiced by the presence of counsel or the presentation of mitigating evidence, and the defense does not argue otherwise on appeal. Suffice it to say that defendant was competent to plead guilty under the *Eyman* standard. We find no reversible error.

### III. *Imposition of the Death Sentence*

#### A. *Constitutionality of the Death Penalty*

Appellate defense counsel contends that the Arizona death penalty statute, A.R.S. § 13–703, is unconstitutional because it (1) precludes the sentencer from considering all relevant, mitigating circumstances; (2) presumes the death penalty to be the appropriate sentence; and (3) removes from the jury the determination of the factual elements of capital murder.

The United States Supreme Court recently addressed and rejected all three arguments in *Walton v. Arizona*, 497 U.S. 639, ——, 110 S.Ct. 3047, 3054–56, 111 L.Ed.2d 511 (1990), *aff'g* 159 Ariz. 571, 769 P.2d 1017 (1989). This court reached the same result in a long line of other cases. *See State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988) (burden of proof

---

**7.** According to a minute entry, the trial judge "reviewed the law in regard to whether mitigation witnesses should be brought to Court to testify on behalf of the Defendant...." Section 13–703 states that the trial court "shall conduct a separate sentencing hearing to determine the existence or nonexistence" of aggravating and

mitigating circumstances. Case law also instructs that the sentencing authority should be well informed of the circumstances of the offense and the character, record, and propensities of the offender. *See, e.g., Richmond v. Cardwell,* 450 F.Supp. 519, 521 (D.Ariz.1978).

for mitigation and lack of jury participation are not unconstitutional), *aff'd, Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *State v. Correll,* 148 Ariz. 468, 483–84, 715 P.2d 721, 736–37 (1986) (denial of jury sentencing and defendant's burden of proving mitigating evidence are not unconstitutional); *State v. Bracy,* 145 Ariz. 520, 536, 703 P.2d 464, 480 (1985) (restricting judge's sentencing discretion is not unconstitutional); *State v. Harding,* 137 Ariz. 278, 293, 670 P.2d 383, 398 (1983) (failure to involve a jury in the capital sentencing decision does not violate the sixth amendment).

Consistent with the above precedent, we reject appellate defense counsel's arguments and reaffirm this state's death penalty statute as constitutional.

### B. *Prosecutorial Sentencing Recommendations*

Approximately three weeks after accepting defendant's plea, the trial court commenced an evidentiary hearing to determine the existence of statutory aggravating and mitigating circumstances, A.R.S. § 13–703(F)–(G), as well as any other mitigating factors defendant wished to proffer. The hearing was continued for another three weeks, at which time the prosecution offered evidence and testimony in support of the aggravating factors the State believed to exist. Despite his decision to present aggravating evidence, the prosecutor recommended that defendant "serve life in prison, rather than death."

This sequence of events forms the basis of two defense arguments asserted on appeal. First, defendant was denied effective assistance of counsel because his trial attorney failed to recognize the dispensability of aggravating evidence in light of the prosecutor's recommendation of a life sentence. Second, absent a recommendation by the prosecutor in favor of death, the trial court possessed no authority to consider the death penalty. We will consider both issues separately.

### 1. Assistance of Counsel

■ With the aid of hindsight, defendant's new counsel on appeal maintains that the trial attorney erred in not seeking a stipulated life sentence agreement and by failing to object to the presentation of aggravating evidence. In support of this view, defendant's opening brief contains an affidavit by the prosecutor stating that the trial judge and defense counsel were informed of the prosecutor's decision to recommend life during an in-chambers conference immediately before the aggravation/mitigation hearing. The State responds that defense counsel's performance leading up to and during sentencing does not give rise to a constitutional claim.

■ To establish an ineffective assistance of counsel claim, defendant must prove (1) that his counsel lacked minimal competence as determined by prevailing professional norms, *State v. Nash,* 143 Ariz. 392, 397, 694 P.2d 222, 227 (1985); and (2) that counsel's deficient performance prejudiced the defense, *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984). *Accord, Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (defendant must show deficient conduct and resulting prejudice). To show prejudice, "the defendant must be able to demonstrate a 'reasonable probability' that the verdict might have been affected by the error." *State v. Walton,* 159 Ariz. 571, 592, 769 P.2d 1017, 1038 (1989), *aff'd, Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *citing Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We need not address both prongs of the inquiry if defendant fails to prove either one. *State v. Salazar,* 146 Ariz. 540, 541, 707 P.2d 944, 945 (1985).

■ We also note that the assistance of counsel issue was not raised with the trial court because of defendant's desire to forego all discretionary motions and proceedings. Because competent trial strategy and performance may take on as many forms as there are cases, "this court is reluctant to decide claims of ineffective assistance in advance of an evidentiary hearing to determine the reasons for coun-

sel's actions or inactions on any particular point." *State v. Valdez,* 160 Ariz. 9, 14, 770 P.2d 313, 318 (1989). If a defendant wishes to raise an ineffective assistance of counsel issue, "he should ordinarily begin someplace other than in this court," 160 Ariz. at 15, 770 P.2d at 319, *citing State v. Guerrero,* 159 Ariz. 568, 569, 769 P.2d 1014, 1015 (1989), preferably by filing a petition for post-conviction relief pursuant to rule 32, Arizona Rules of Criminal Procedure. We have held, therefore, that we will not consider an ineffective assistance claim asserted for the first time on appeal unless the record clearly demonstrates that the claim is meritless. *State v. Carver,* 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989). This case qualifies under that limited exception.

Even assuming, without deciding, that defense counsel was given prior notice of the prosecutor's intention to recommend a life sentence, we believe counsel saw few advantages in seeking sentencing negotiations with the State. Aside from revealing its sentencing position minutes before the aggravation/mitigation hearing,[8] the State proceeded throughout the hearings as if it would seek nothing but the death sentence. The State had refused to negotiate plea agreements on prior occasions,[9] and its decision to recommend a life sentence fell short of expressing a desire to do so at the 11th hour, especially when the prosecutor did not renounce his resolve to offer evidence and witnesses proving the existence of aggravating factors.[10] Defendant's own desire to receive the death penalty also strongly suggests that he would have rejected any stipulated life sentence had one been procured. This conclusion is confirmed by defendant's expressed request in

this court to dismiss this appeal and receive the death penalty.

■ Defense counsel, furthermore, was in no position to block the State from presenting evidence in aggravation. "The decision to offer evidence of aggravation or not offer such evidence is the responsibility of the prosecutor. The [trial] court has no authority to interfere with the discretion of the prosecutor in this area." *State v. Murphy,* 113 Ariz. 416, 418, 555 P.2d 1110, 1112 (1976). Defense counsel in this case had no more authority than the trial court to prohibit or compel the prosecutor's decision to offer evidence of aggravating circumstances.

We hold that defense counsel's conduct fell "within the wide range of reasonable professional assistance...." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

### 2. Recommendation Effects

Equally meritless is appellate defense counsel's belief that the trial court was bound by the prosecutor's recommendation of sentence. The exercise of discretion by the prosecutor may begin well before charges are filed and extend into the sentencing phase, *see Gregg,* 428 U.S. at 199, 96 S.Ct. at 2937 (prosecutor's authority to select those defendants he wishes to prosecute for a capital offense is not unconstitutional), but we believe it ends in a capital case with the prosecutor's decision to present or ignore evidence of aggravation.

■ If the prosecutor decides not to put on evidence of aggravation, the trial court may not force him to do otherwise. *Murphy,* 113 Ariz. at 418, 555 P.2d at 1112. Conversely, once the prosecutor pleads and offers evidence in support of aggravation,

---

**8.** The prosecutor states in his affidavit that he decided to recommend a life sentence "a couple of weeks before the scheduled sentencing hearing," and that he "believe[d]" defense counsel was aware of that decision. However, defendant's appellate counsel offers no other proof that Mr. Hurst knew about the recommendation before the date of sentencing.

**9.** Before the change of plea hearing, for example, defense counsel received a letter from the State refusing to enter into plea negotiations,

and the prosecutor himself reiterated that position in court.

**10.** This court has recently formalized the procedure by which the state provides notice that it intends to seek the death penalty. Rule 15.1(g), Arizona Rules of Criminal Procedure (amended June 27, 1991, effective July 1, 1991), now requires the prosecutor to give notice "no later than 30 days after the arraignment in superior court."

**500**

as in this case, our statutes require that the *trial court* determine whether aggravating circumstances exist in fact, and whether they are outweighed by any mitigating circumstances calling for leniency. A.R.S. § 13–703(D)–(E). Thus, although the prosecution determines whether the State will *seek* the death penalty, it does not decide the *propriety* of that penalty once placed in issue during sentencing.

Although the prosecutor's affidavit claims that aggravating evidence was presented on the mistaken belief that it is required under Arizona law, *Murphy* clearly holds otherwise. We have no choice, therefore, but to assess the exercise of prosecutorial discretion by actions and not words. Here, the prosecutor presented evidence of aggravation and the court found the existence of aggravating circumstances. Having thus presented the aggravating circumstances to the trial court, the prosecutor may not thereafter backpedal and require the trial court to impose a life sentence. The trial court committed no error in refusing to adopt the State's sentencing recommendation.

### C. *Independent Review*

The severity of the death penalty requires that we undertake an extensive, independent review of each death sentence handed down under Arizona law. *Richmond*, 114 Ariz. at 196, 560 P.2d at 51. As explained in *State v. Watson*, 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981), "[a] finding merely that the imposition of the death penalty by the trial court was 'factually supported' or 'justified by the evidence' " is not the appellate treatment that the death penalty warrants. We must determine for ourselves whether "we believe that the death penalty should be imposed." *Id.* We make this decision after searching the entire record for error, examining the evidence establishing the presence or absence of aggravating and mitigating circumstances, and determining whether the latter circumstances outweigh the former when both are present. *See Richmond*, 114 Ariz. at 196, 560 P.2d at 51.

1. Aggravating Factors: A.R.S. § 13–703(F)

Section 13–703(E) precludes the death penalty unless the first-degree murder "is accompanied by at least one of seven statutory aggravating circumstances." *State v. Rockwell*, 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989). "The state must prove aggravating circumstances beyond a reasonable doubt." *Id., citing State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983). Upon completion of the aggravation/mitigation hearing, the trial court issued a special verdict finding the presence of two aggravating circumstances: (1) "defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense," A.R.S. § 13–703(F)(3); and (2) "defendant committed the offense in an especially heinous, cruel or depraved manner," A.R.S. § 13–703(F)(6).

### (a) *Grave Risk of Death to Another Person*

In this case, the subject of the "grave risk" aggravating factor claim was the unborn fetus. The defense protests any consideration of the fetus in finding this aggravating circumstance because it believes a fetus is not "another person" for purposes of aggravation under § 13–703(F)(3), and because the defendant intended to kill the fetus as well as his girlfriend. We need not address the former proposition because the record shows, and the State concedes, that defendant acted with intent to kill the fetus. Under the rule established in *State v. Johnson*, 147 Ariz. 395, 400, 710 P.2d 1050, 1055 (1985), the "grave risk" aggravating circumstance does not apply in cases in which "the other person endangered was a victim or intended victim of the criminal conduct." Even if this victim's fetus was "another person" under § 13–703(F)(3), it was also an intended target of defendant's crime. We hold, therefore, that the "grave risk" aggravating circumstance does not exist in this case.

In the event an aggravating circumstance is set aside on appeal, we have discretion to remand the case for resen-

tencing based on the remaining aggravating factors. *State v. Fierro*, 166 Ariz. 539, 555, 804 P.2d 72, 88 (1990) (court could remand case because the trial court erred with respect to one of three aggravating factors). Here, however, the trial judge specifically noted in his special verdict "that each of the aggravating circumstances standing alone would be sufficient to mandate the death penalty...." We will proceed, therefore, with our consideration of the remaining sentencing issues. *State v. McCall*, 139 Ariz. 147, 161 n. 4, 677 P.2d 920, 934 n. 4 (1983) (elimination of one aggravating factor "does not mandate a remand to the trial court").

*(b) Heinous, Cruel, or Depraved Manner*

Objections to the court's finding of an "especially heinous, cruel or depraved manner" are threefold: (1) the § 13–703(F)(6) aggravating circumstance is unconstitutionally vague on its face; (2) the facts in this case do not show that defendant murdered his victim in an "especially heinous, cruel or depraved manner"; and (3) the trial court considered improper evidence in making its finding under § 13–703(F)(6). The United States Supreme Court recently rejected the first argument in *Walton*, 497 U.S. at ——, 110 S.Ct. at 3056–58 ("the definition given to the 'especially cruel' provision ... is constitutionally sufficient"), and we need not discuss it further.

■■■■ The legislature phrased the "heinous, cruel *or* depraved" (emphasis added) circumstance in the disjunctive, so we may find aggravation if the evidence establishes any one of the three factors. *Walton*, 159 Ariz. at 587, 769 P.2d at 1033; *Correll*, 148 Ariz. at 480, 715 P.2d at 733. Cruelty is defined as the infliction of pain and suffering in a wanton, insensitive, or vindictive manner. *Correll*, 148 Ariz. at 480, 715 P.2d at 733; *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. "Cruelty can involve mental as well as physical suffering," especially if a victim experiences significant uncertainty as to the ultimate fate. *Correll*, 148 Ariz. at 480, 715 P.2d at 733; *see also State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984).

■■ We do not doubt the cruel nature of this murder. As explained in the trial court's special verdict,

The Defendant ... told the victim he was going to kill her and a fierce struggle ensued. During that struggle, which lasted approximately 45 minutes,

(A) the defendant told the victim his intent was to kill her.

(B) the victim resisted in every way she could.

(C) the defendant "... proceeded to beat her, strangle her, pound her, throw her, bash her head against the wall, tried to break her arms so she couldn't claw my eyes out." (defendant's words).

(D) the defendant attempted to break the victim's arms by smashing them against the dresser drawers.

(E) the defendant tried to gouge out the victim's eyes and, in fact, did cause severe damage to the victim's eyes.

(F) the defendant bit the victim in several places.

(G) the victim almost escaped several times but the defendant was able to overcome her.

(H) the victim was bruised on most of her body.

... the victim was, until very near the end of this 45–minute struggle, conscious and able to not only resist her attacker but also feel the pain being inflicted upon her and experience the anguish and terror of knowing that the defendant intended to kill her.

That the defendant had several opportunities to reflect on the cruelty and wrongfulness of his actions as well as the pain being suffered by the victim, and yet did not abate.

That the defendant choked the victim to a point where he thought she was dead not once, not twice, but three times before the deed was done.

Any suggestion by the defense that the victim's suffering was unforeseeable or short-lived is without merit. We believe the defendant was fully aware that his attack would inflict great physical and emotional pain. The victim's ordeal, moreover,

was sufficiently prolonged and painful to warrant a finding of cruelty. Dr. Forrest R. Ritland gave the following testimony summarizing his autopsy findings:

> [T]he intensity and severity of the injuries would certainly indicate, I believe, enormous pain, particularly the injury to the eye. The contusions and trauma to the extremities, that I also believe would be painful, and the degree of that pain is difficult to determine, but as shown by the pictures, she has quite a large number of significant bruises, abrasions, and so forth, which I believe would be associated with significant pain.

In short, we believe few murders exhibit the degree of cruelty evidenced in this case.

■■■■■ The terms "heinous" and "depraved" focus on the defendant's mental state and attitude as reflected by his words and actions. *State v. Wallace*, 151 Ariz. 362, 367, 728 P.2d 232, 237 (1986). We look for the following indicia of heinousness and depravity: (1) apparent relishing of the murder; (2) infliction of gratuitous violence on the victim beyond the murderous act itself; (3) mutilation of the victim's body; (4) senselessness of the crime; and (5) helplessness of the victim. *Gretzler*, 135 Ariz. at 51–52, 659 P.2d at 10–11. Factors 4 and 5 do not warrant a finding of heinousness or depravity unless accompanied by additional factors. *Correll*, 148 Ariz. at 481, 715 P.2d at 734.

■■■ The facts do not show that defendant relished the murder or mutilated the victim's body after death. Like the trial court, however, we believe that a fair reading of the record compels a finding of senselessness, helplessness, and gratuitous violence. The victim was defendant's girlfriend and future mother of his child. We see no reason for the murder other than a disagreement spawned by her threat to leave him. The victim was also more than 5 months pregnant and was not a significant threat to defendant. Although she was able to put up an initial fight, her ability to resist became increasingly impaired as the vicious assault continued. She was entirely helpless near the end of the attack, especially after she was rendered unconscious during the multiple strangulations.

Without question, defendant's act of necrophilia inflicted gratuitous violence on the victim. The defense strongly objects to any finding of gratuitous violence in this case, arguing that the record contains only equivocal evidence that defendant engaged in sexual intercourse with the victim's corpse. The medical examiners, for example, saw no visible signs of trauma to the vulva or vagina, and although vaginal and rectal swabs were taken to verify the presence of semen, the prosecutor did not offer the results into evidence. Dr. Bayless testified that he did not believe defendant had sex with the corpse, and that defendant fabricated the act so that he would receive the death penalty and fulfill his homicide-suicide mission. Dr. Bayless also claims that defendant recanted the necrophilia portion of his confession during a psychiatric examination. However, during the presentencing hearing, defendant explained that he changed his confession during the examination because he was afraid Dr. Bayless would find him insane. He then reaffirmed his original admission of having sex with the corpse.

While failing to show that intercourse did not occur, the arguments relied upon by the defense also ignore significant evidence that it did. Just a few hours after the murder, defendant typed out his own confession in which he admitted to having sex with the corpse. Defendant stated that he "waited some time after [he] thought she was dead, took a shower, had sex with her, checked her pupils, dressed and called the police." Thus far, we have found no cause to question defendant's confession, as most of its details have been corroborated through police investigation and court inquiry. Police photographs confirm that defendant had removed the victim's pants and underwear. Also, given the fact the victim was dead, we cannot assume that the victim could resist intercourse and cause vaginal trauma. Finally, we believe it incredible that, at the time of the murder, defendant was sufficiently versed in the intrica-

cies of our death penalty jurisprudence to know that an act of necrophilia may establish an aggravating circumstance under § 13–703(F)(6). Our statutes do not require that the State must offer conclusive proof of aggravation. It need only show heinousness and depravity beyond a reasonable doubt, *see Rockwell,* 161 Ariz. at 14, 775 P.2d at 1078 (aggravation must be proven beyond a reasonable doubt; defendant must prove mitigating circumstances by a preponderance of the evidence), and we believe it sustained that burden in this case.

The final objection to aggravation is that the trial court relied upon inadmissible evidence to find cruelty and heinousness in violation of our statutes and defendant's rights under the confrontation and due process clauses. Specifically, the defense believes that the trial court used sentencing memoranda and a presentence report containing inadmissible hearsay, victim impact statements, and police opinion in making its aggravation findings. Section 13–703(C) governs the admission of evidence at sentencing and provides in part:

> Any information relevant to any mitigating circumstances ... may be presented by either the prosecution or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, *but the admissibility of information relevant to any of the aggravating circumstances ... shall be governed by the rules governing the admission of evidence at criminal trials.*

(Emphasis added.)

The State counters with language from the same statute providing that "[e]vidence admitted at the *trial,* relating to such aggravating or mitigating circumstances, shall be considered without reintroducing it at the sentencing proceeding." A.R.S. § 13–703(C) (emphasis added). The State believes, therefore, that whenever a defendant is convicted pursuant to a guilty plea, any information forming the factual basis of that plea is admissible for purposes of determining the appropriate sentence. This information may consist of "reports of preliminary hearings, the defendant's admissions, and other sources," *State v. McVay,* 131 Ariz. 369, 373, 641 P.2d 857, 861 (1982), including "presentence reports," *State v. Freda,* 121 Ariz. 430, 432, 590 P.2d 1376, 1378 (1979).

The State's theory appears misguided. This case did not involve a trial, and we need not decide whether § 13–703(C) furthers the State's position. The State's cases simply describe what the trial judge may consider in accepting a plea. They do not address the admissibility of evidence at sentencing once the plea is accepted. Thus, we choose to resolve the instant admissibility issue on less technical grounds. That is, we believe that the record contains sufficient evidence apart from the sentencing memoranda and presentence report to find aggravation. The State's evidence presented during the aggravation/mitigation hearing consists of defendant's confession, the autopsy report, photographs of the crime scene, and testimony by two witnesses, including the doctor who performed the autopsy. The exhibits alone attest to the brutality, savagery, and senselessness of the murder, as well as the helplessness of the victim. As for evidence of gratuitous violence, defendant admits to having sex with the corpse and photographs showed the victim nude from the waist down. The trial judge, therefore, did not need to supplement the record with information from the sentencing memoranda or presentence report to find proof of aggravation beyond a reasonable doubt.

■ We will presume "that a trial judge, aware of the rules of evidence, will not consider inadmissible evidence in making his ruling." *Fierro,* 166 Ariz. at 548, 804 P.2d at 81, *citing State v. Hadd,* 127 Ariz. 270, 275, 619 P.2d 1047, 1052 (App. 1980). "Absent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors." *State v. Beaty,* 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989). The defense did not,

and cannot, offer any specific proof that the trial judge based his findings of aggravation on information contained solely in the sentencing memoranda or presentence report.[11] Even if he did, the cumulative nature of the evidence contained in either source would preclude a finding of reversible error. We also note that the United States Supreme Court recently lifted its ban on the use of victim impact statements and prosecutorial argument, stating that "the Eighth Amendment erects no per se bar" to the admission of such evidence at sentencing. *Payne v. Tennessee,* — U.S. —, —, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) *overruling Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

We affirm the trial court's findings of an "especially heinous, cruel or depraved manner."

2. Mitigating Factors: A.R.S. § 13–703(G)

■■■■ In sentencing a defendant convicted of first-degree murder, the sentencer must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining" the appropriate sentence. *Fierro,* 166 Ariz. at 551, 804 P.2d at 84, *citing McCall,* 139 Ariz. at 162, 677 P.2d at 935. Defendant must prove the existence of mitigating factors by a preponderance of the evidence. *Fierro,* 166 Ariz. at 551, 804 P.2d at 84. Although the trial judge must consider all mitigating evidence proffered by the defendant, "it is within the discretion of the trial judge how much weight should be given to the proffered mitigating factors." *Id., citing Jeffers v. Ricketts,* 627 F.Supp. 1334, 1357 (D.Ariz.1986), *aff'd in part,*

*rev'd in part,* 832 F.2d 476 (9th Cir.1987), *rev'd,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

■■■■ Here, the trial court found no mitigating circumstances sufficient to require a penalty less than death. The defense maintains that the court either failed to recognize or gave insufficient mitigating effect to the following factors: (1) mental impairment; (2) duress; (3) age; (4) lack of a criminal record; (5) upbringing; and (6) feelings of remorse. On appeal, our task is independently to "review the record to determine whether any mitigating circumstances outweigh aggravating circumstances." *State v. Robinson,* 165 Ariz. 51, 61, 796 P.2d 853, 863 (1990), *cert. denied,* — U.S. —, 111 S.Ct. 1025, 112 L.Ed.2d 1107 (1991), *citing State v. Stevens,* 158 Ariz. 595, 598, 764 P.2d 724, 727 (1988); *Richmond,* 114 Ariz. at 196, 560 P.2d at 51. Like the trial court, we find that none of the alleged mitigating factors, taken alone or collectively, is "sufficiently substantial to call for leniency." *See* A.R.S. § 13–703(E).

At the heart of the foregoing claims of mitigation is a combination of psychological and emotional problems that have plagued defendant at some point in his life prior to the murder, including a defective personality structure, immaturity, suicidal impulses, phobic reactions, detachment, and feelings of depression, dependency, and inadequacy. Both mental experts diagnosed defendant's condition as a borderline personality disorder stemming from a lack of social interplay during childhood and a dysfunctional relationship with his mother. According to the defense, this disorder not only impaired defendant's "capacity to appreciate the wrongfulness of his conduct or to conform

---

**11.** The defense simply relies upon an excerpt from the special verdict stating that the trial court considered "information presented at the presentencing hearing, the presentence report, and the sentencing memoranda ... [in making] findings as to the existence or nonexistence of each of the aggravating circumstances ... *and* as to the existence or nonexistence of any mitigating circumstances." (Emphasis added.) Because the trial court must consider "any aspect of the defendant's character or record and any circumstance of the offense" relevant to mitiga-

tion, *see Fierro,* 166 Ariz. at 551, 804 P.2d at 84, the court was clearly entitled to consider the sentencing memoranda and presentence report before determining defendant's sentence.

That it did so, however, does not mean that the court relied upon the *same* sources to find aggravating circumstances. As previously indicated, the information presented at the presentencing hearing alone establishes an adequate evidentiary basis for aggravation. We believe, therefore, that the defense failed to rebut the *Fierro/Beaty* presumption.

his conduct to the requirements of the law," *see* § 13–703(G)(1), but also caused defendant to experience "unusual and substantial duress," eventually forcing him to commit first-degree murder, *see* § 13–703(G)(2).

First, we do not believe that the mitigating circumstance of § 13–703(G)(1) exists in this case. Generally, a mere character or personality disorder alone is insufficient to constitute a mitigating circumstance. *State v. Gerlaugh*, 144 Ariz. 449, 459, 698 P.2d 694, 704 (1985); *State v. McMurtrey*, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983); *Vickers*, 129 Ariz. at 515–16, 633 P.2d at 324–25; *Richmond*, 114 Ariz. at 197–98, 560 P.2d at 52–53. Such conditions "differ in degree from a slow, dull, brain-damaged defendant whose judgment and rationality are marginal." *Walton*, 159 Ariz. at 588, 769 P.2d at 1034, *citing State v. Ceja*, 126 Ariz. 35, 40, 612 P.2d 491, 496 (1980) (because defendant was not a slow, brain-damaged individual, his personality defects did not require leniency). "Mental impairments have far greater mitigating effect because they may evidence an inability of the defendant to control his conduct." *Walton*, 159 Ariz. at 588, 769 P.2d at 1034, *citing State v. Doss*, 116 Ariz. 156, 163, 568 P.2d 1054, 1061 (1977). This case does not involve the same level of mental disease or psychological defects considered in other cases in which the § 13–703(G)(1) mitigating circumstance was found to exist. *See, e.g., State v. Jimenez*, 165 Ariz. 444, 456–59, 799 P.2d 785, 797–800 (1990) (schizotypal psychotic illness, command hallucinations and voices, borderline intelligence); *State v. Mauro*, 159 Ariz. 186, 208, 766 P.2d 59, 81 (1988) (chemical disorder in the brain); *State v. Graham*, 135 Ariz. 209, 213, 660 P.2d 460, 464 (1983) (valium intoxication, neurological problems, and brain damage); *State v. Brookover*, 124 Ariz. 38, 41, 601 P.2d 1322, 1325 (1979) ("prenatal neurological lesion" that disrupted the integration and storage of information).

Although defendant's personality disorder does not rise to the level of a statutory mitigating circumstance, we must still determine whether it should be given independent mitigating weight. *McMurtrey*, 136 Ariz. at 101–02, 664 P.2d at 645–46 (mitigating evidence may not fit a statutory category, but it may suggest other reasons for leniency). Defendant may present "additional evidence to show that the 'disorder' is capable of significantly impairing a person's capacity." *Vickers*, 129 Ariz. at 515–16, 633 P.2d at 324–25, *citing State v. Jordan*, 126 Ariz. 283, 290, 614 P.2d 825, 832 (1980). The trial court considered defendant's personality disorder but concluded that

> Defendant's capacity to appreciate the wrongfulness of his conduct was not impaired. Further, the Defendant's ability to conform his conduct to the requirements of the law was perhaps minimally impaired, but not so impaired to constitute either a defense to prosecution or a significant mitigating factor.

The trial court's finding is correct. The evidence of defendant's troubled background establishes only that a personality disorder exists. It does not prove that, at the time of the crime, the disorder controlled defendant's conduct or impaired his mental capacity to such a degree that leniency is required. *Compare Vickers*, 129 Ariz. at 516, 633 P.2d at 325 (record showed that a character disorder existed, but not that it impaired mental capacity or influenced behavior), *with Doss*, 116 Ariz. at 159, 163, 568 P.2d at 1057, 1061 (evidence showed that defendant's epilepsy, abnormal mental condition, and serious personality disorder were substantial factors in causing the crime). When asked about the connection between defendant's disorder and the present murder, Dr. Bayless stated,

> The linkage here is that this young man had developed a pathological dependency on a person who—who had told him that they were going to separate, and from that point, that is where the string actually broke, in which then his judgment—because judgment is very much impaired with this disorder. Under stress, his foresight, his insight, his willingness to look at reasonable solutions, his willing-

ness to—to have some dependency on himself and defend [sic] on himself for his own needs, became extremely impaired and distorted. At that point his only out was that, and we also see anger with this disorder. You see the lashing out of anger with this disorder.

We refuse to equate defendant's *willingness* to control his actions with his *ability* to do the same. Although defendant may have found it difficult to conform his conduct to the law, we believe he possessed the ability to restrain himself. He certainly resisted whatever impulses he may have experienced long enough to insure his own safety by locking the roommate's dog in another room before commencing his attack on the victim. We agree with the trial court that defendant's ability to conform his conduct to the requirements of the law was perhaps minimally impaired, but not so impaired to constitute either a defense to prosecution or a significant mitigating factor.

That defendant appreciated the wrongfulness of his conduct cannot be questioned. Both mental experts found that defendant possessed superior cognitive abilities and was legally sane under the *M'Naghten* rule, and neither expert gave any indication that defendant did not know the difference between right and wrong during the commission of the crime. Dr. Gerstenberger's report specifically found that defendant "was aware of the nature and consequences of his acts" at the time of the alleged offense. Dr. Bayless also testified that a borderline personality disorder

is not akin now to schizophrenia, which is a break from reality. Persons who have personality disorders are *in touch with reality*. Their motivation and things that they may do, which comes into conflict with society, are typically based on impaired thinking, but not so that there are delusions such as hearing voices or command voices, or are hallucinations where they see things that are not here or not there, or feel that there are persecution complexes, or anything like that is not necessarily going on.

(Emphasis added.) The record reveals that defendant made a conscious and knowing decision to murder the victim and was fully aware of the wrongfulness of his actions. Defendant's emotional state may be symptomatic of many things, but not of a marginal capacity to recognize the wrongfulness of his conduct or control his behavior. Defendant's borderline personality disorder does not warrant a reduction of his sentence to life imprisonment. *See Walton,* 159 Ariz. at 588, 769 P.2d at 1034 ("sociopathology and personality disorders have not sufficed to tilt the balance in favor of leniency").

■ Nor do we believe defendant is entitled to leniency because of duress. "We have defined duress as 'any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will.'" *Wallace,* 151 Ariz. at 369, 728 P.2d at 239, *citing State v. Castaneda,* 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986), *quoting Black's Law Dictionary* 452 (5th ed. 1979). "The clear import of this definition is that one person must coerce or induce another person to do something against his will." *Castaneda,* 150 Ariz. at 394, 724 P.2d at 13. Under the rule announced in *Castaneda,* personality disorders or impulse control problems do not "fall within the meaning of duress" under § 13–703(G)(2). *Id.* This is not to say, of course, that defendant did not experience any duress during the events leading up to the murder. The record shows to some degree that he did, and we take notice of that fact in assessing his sentence. However, we agree with the trial court that the fright and anger occasioned by defendant's disorder is "only a minimal mitigating factor."

As to age, defendant was 22 years old when he committed the murder. We have rejected age as a mitigating circumstance in cases in which the murderer was much younger than defendant. *See, e.g., Walton,* 159 Ariz. at 589, 769 P.2d at 1035 (age 20 not a mitigating factor); *Gerlaugh,* 144 Ariz. at 460–61, 698 P.2d at 705–06 (age 19

not a mitigating factor); *State v. Clabourne*, 142 Ariz. 335, 348, 690 P.2d 54, 67 (1984) (age 20 not a mitigating factor); *State v. Gillies*, 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983) (age 20 not a mitigating factor).

Chronological age, however, is not always dispositive of one's maturity. *Walton*, 159 Ariz. at 589, 769 P.2d at 1035; *see also State v. Roscoe*, 145 Ariz. 212, 226–27, 700 P.2d 1312, 1326–27 (1985) (age cannot be considered in a vacuum). Factors such as intelligence, past experience, and the extent and duration of the crime are also relevant in determining whether leniency should be afforded because of youth. *Walton*, 159 Ariz. at 589, 769 P.2d at 1035; *Ceja*, 126 Ariz. at 38, 612 P.2d at 494. Given defendant's superior I.Q., his college and work experience, his interaction with the trial court, and the deliberateness with which he performed the prolonged, homicidal attack, we find that age is not a mitigating factor under A.R.S. § 13–703(G)(5) or otherwise.

Remorse may be a mitigating factor if found to exist. *See Clabourne*, 142 Ariz. at 348, 690 P.2d at 66. Pastor John Schaumburg testified at the aggravation/mitigation hearing that defendant expressed some "sense of remorse" during a conversation approximately 2 or 3 weeks after the murder. The trial judge failed to mention remorse in his special verdict, but he did so for a good reason. Defendant's "sense of remorse" is not the type of sorrow or penance that deserves consideration. Illustrative are defendant's own statements to the court before sentencing:

I'm very upset with myself that I have breached this law, not just because it is a law of the State of Arizona, and I believe just about every single place in the

world, but because it's an act against God in just about every religion, I believe. But, I still have—it's hard to separate those feelings, because I am upset about that—that I killed, that I took a life. I'm upset about the good times I miss with [the victim], the times when we would go horseback riding, when we would take our Girl Scout troupes [sic] on various activities, when we would go whitewater rafting, or just sitting around playing computer games. *I miss those greatly, but do I miss [the victim]? No, not one bit. Perhaps "glad" is too positive of a word. I am not in the least bit unhappy she is dead.*

(Emphasis added.) We find that defendant lacks any true sense of remorse for his crime.

As the trial court noted, defendant's upbringing [12] and his lack of a prior record are very pertinent factors in sentencing. However, like the rest of the evidence offered in mitigation, these factors do not outweigh the aggravating evidence.

Having considered and weighed *all* the mitigation evidence presented, we find that, although it is significant, it is not sufficiently substantial to require leniency in light of the shocking cruelty and senselessness of defendant's crime. We believe the death penalty is warranted in this case.[13]

## IV. *Fetal Manslaughter Statute: A.R.S. § 13–1103(A)(5)*

Finally, the State argues in a separate appeal that the trial court erred in dismissing the charge of first-degree murder of the fetus. The trial court dismissed on the ground that the fetal manslaughter statute, § 13–1103(A)(5), precludes the State from prosecuting a defendant for the death of an unborn child under the homi-

---

**12.** Defendant experienced many emotional problems as a child and early teen, but he lived an otherwise normal and uneventful childhood.

**13.** The author and Justice Moeller do not believe that a proportionality review of defendant's death sentence is either authorized by law or effective in achieving its stated purpose. *See* concurring opinions of Justices Corcoran and Moeller in *State v. White*, 168 Ariz. 500, 815 P.2d 869 (1991). Consequently, this opinion does not

compare defendant's sentence with the punishment imposed on others convicted of a similar crime as reported in published opinions.

Other justices on this court, however, continue to support the court's self-imposed proportionality review requirement. *See* concurring opinion of Justice Feldman in *White*. Their proportionality assessment may be found in the special concurrence to this opinion.

cide statutes. That section states that a person commits manslaughter by

> [k]nowingly or recklessly causing the death of an unborn child at any stage of its development by any physical injury to the mother of such child which would be murder if the death of the mother had occurred.

Like the trial court, we believe that the legislature's enactment of the fetal manslaughter statute conclusively resolves the question of whether this state's homicide statutes apply to the death of the fetus. As the trial court's minute entry explains,

> A.R.S. 13–1103(A)[(5)] *specifically* deals with the facts of this case. The fact that the Defendant has stated repeatedly that he intended to kill the fetus meets the requirement of "knowingly" committing an act pursuant to A.R.S. 13–1103(A)(5) and does not make [the first-degree murder statute] more or less applicable.

> [We] can assume that the legislature, when it drew up this statute in 1983, considered the complex issue of when the murder statute should apply and, when confronted with the complex legal, medical and moral questions involved in this issue, chose to create a lesser offense to murder, i.e. manslaughter, when the death of an unborn fetus is involved. We are not dealing with an ancient statute, we are dealing with a relatively new pronouncement by the legislature on what the law is.

> A decision of this magnitude is best left to the legislature and it has spoken.

Because we hold that defendant may not be charged for first-degree murder of the fetus, we decline the State's invitation to decide whether the fetus was a "human being" as defined by the homicide statute. *See* A.R.S. § 13–1101(3) (" 'Person' means a human being."). In dismissing the charge, the trial court expressly stated that the state was free to proceed on a manslaughter charge with respect to the fetus. However, the state failed to do so.

## DISPOSITION

In the case involving the victim's death, we have examined the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 744–45, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967), and *State v. Leon*, 104 Ariz. 297, 298–99, 451 P.2d 878, 879–80 (1969). Having found none, we affirm defendant's conviction upon a plea of guilty and his sentence of death.

We affirm the trial court's dismissal of the first-degree murder charge for the death of the fetus.

MOELLER, V.C.J., concurs.

CAMERON, Justice, specially concurring:

Because we have affirmed defendant's conviction, we must conduct a proportionality review to determine "whether the sentence[] of death [is] excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51, *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977); *see also State v. White*, 168 Ariz. 500, 815 P.2d 869 (1991); *State v. Lavers*, 168 Ariz. 376, 814 P.2d 333, *cert. denied*, — U.S. ——, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991). In Arizona the death penalty is reserved for cases exhibiting "the most aggravating of circumstances, [those that] are so shocking or repugnant that the murder stands out from the normal first degree murder," or cases in which "the background of the defendant sets him apart from the usual murderer." *State v. Watson*, 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981).

First, we have reviewed cases from throughout the country involving murders of pregnant women by individuals who knew of their victims' conditions. These cases reveal that crimes similar to that committed by defendant are regularly punished by death. *See, e.g., State v. Amaya-Ruiz*, 166 Ariz. 152, 177–78, 800 P.2d 1260, 1285–86 (1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991) ("De-

fensive wounds on pregnant victim's hands indicate that she struggled to save her life," and "blood was splattered through several rooms indicating that defendant pursued the victim as she unsuccessfully fought for her life." No mitigating factors were sufficiently substantial to call for leniency, so the death penalty was affirmed.); *Heath v. State*, 536 So.2d 142 (Ala.Crim. App.1988) (death penalty affirmed for appellant who paid third party $2,000 to shoot his nine-months pregnant wife); *People v. Hamilton*, 48 Cal.3d 1142, 259 Cal.Rptr. 701, 774 P.2d 730 (1989) (after extensive plotting and numerous failed attempts, defendant twice shot and killed his pregnant wife, the mother of his four children; death penalty affirmed); *People v. Manier*, 184 Colo. 44, 518 P.2d 811 (1974) (defendant sentenced to death for shooting his bigamist wife when she was nearly ready to deliver baby of her second husband, whom she wed while defendant was in jail); *Jackson v. State*, 366 So.2d 752 (Fla.1978), *cert. denied*, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979) (death sentence upheld for robber who killed woman, eight-months pregnant, by shooting her, tying electrical cord around her neck and then hiding her (and fetus) in isolated area); *Ruffin v. State*, 397 So.2d 277 (Fla.1981), *cert. denied*, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981) (death penalty imposed on defendant who, with aid of companion, abducted, raped, robbed and pistol-whipped seven-months pregnant victim); *Justus v. Commonwealth*, 222 Va. 667, 283 S.E.2d 905, 913 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 693 (1982) (defendant sentenced to death for the "capital murder during the commission of, or subsequent to, rape ..." of victim who was carrying a near-term fetus). *But see People v. Kuchan*, 219 Ill.App.3d 739, 162 Ill. Dec. 240, 579 N.E.2d 1054 (1991) (trial judge sentenced defendant to imprisonment for his natural life at bench trial after finding defendant's murder of his seven to eight-months pregnant wife and the female fetus she carried was "so vile and repulsive as to almost defy description"); *Soto v. State*, 252 Ga. 164, 312 S.E.2d 306 (1984) (judge sentenced defendant to life imprisonment for his non-trigger-person role in the murder of his pregnant wife after a jury deadlocked on whether the death penalty was appropriate); *People v. Barber*, 116 Ill.App.3d 767, 72 Ill.Dec. 472, 452 N.E.2d 725 (1983) (defendant received life sentence for murder of his ex-wife, who was pregnant by another man, after jury refused to impose the death penalty).

Other defendants' death sentences for murdering pregnant women they knew to be pregnant were reversed due to procedural errors. *See, e.g., State v. Lindquist*, 99 Idaho 766, 589 P.2d 101 (1979) (death sentence set aside despite "abominable and depraved" murder of near-term pregnant victim, because Idaho death penalty statute in effect at time of sentencing deemed unconstitutional); *State v. Smith*, 310 Or. 1, 791 P.2d 836 (1990) (Defendant's pregnant wife died of exposure after he tied her hands and feet behind her back and left her in a remote area. His death sentence was reversed, however, and the case remanded for resentencing due to incomplete jury instructions under the Oregon sentencing statute.); *State v. Moore*, 122 N.J. 420, 585 A.2d 864, 869–70 (1991) (defendant struck wife in head with hammer more than twenty times, killing her, her fetus and her eighteen-month-old son: murder conviction and death sentence reversed because defendant was erroneously required to prove he suffered from a diminished capacity that prevented him from acting purposely, knowingly or recklessly).

We have also reviewed Arizona cases in which the court affirmed death sentences when only one statutory aggravating factor existed, as in this case. *See, e.g., State v. Wallace*, 160 Ariz. 424, 773 P.2d 983 (1989), *cert. denied*, 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990) (death penalty affirmed, given that the killing was especially heinous or depraved and the only mitigating factor was the defendant's remorse); *State v. White*, 168 Ariz. 500, 815 P.2d 869 (1991) (despite mitigating factors regarding defendant's lack of criminal record, his dependent personality, his inability to form and maintain close relationships, his lack of a record of past violent

behavior and his sorrow, death penalty appropriate, considering statutory aggravating factor that murder was committed for pecuniary gain); *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978) (death penalty appropriate because there were no mitigating factors to weigh against aggravating factor of an especially heinous, cruel or depraved manner of killing); *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980) (reduction of sentence from death to life imprisonment not warranted because murder was committed in such an especially heinous, cruel or depraved way and there were "no mitigating circumstances which would indicate the inappropriateness of" the death penalty); *State v. Hensley*, 142 Ariz. 598, 691 P.2d 689 (1984) (mitigating factor that defendant obtained his G.E.D. while in prison not sufficiently substantial to call for leniency when weighed against the statutory aggravating factor that the murder was committed for pecuniary gain); *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54 (1984) (mitigating factors of defendant's young age at the time of the offense and his minimal remorse not sufficient to call for leniency in sentence for murder committed in an especially heinous, cruel or depraved manner); *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1981) (mitigating factors of no prior criminal record and low intelligence not sufficiently substantial to call for leniency in sentencing for murder committed in especially heinous, cruel or depraved manner); *State v. Amaya–Ruiz*, 166 Ariz. 152, 800 P.2d 1260 (1990) (murder was so especially heinous, cruel *and* depraved that mitigating factors of no prior felony, limited intelligence and limited formal education, character evidence indicating no previous history of violence, age and subsequent remorse did not outweigh it).

Likewise, we have studied Arizona cases with findings of one or two statutory aggravating factors in which the sentence was decreased to life imprisonment. *See e.g., State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979) (defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired and this mitigat-

ing factor outweighed the aggravating factor of a previous conviction for which, under Arizona law, a sentence of life imprisonment or death was possible); *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981) (mitigating factors of defendant's age at the time of the offense (21), evidence showing that the victim shot first, codefendant's receipt of a life sentence, defendant's behavior as a model prisoner and his attempt to further his education while in prison called for leniency in his sentence, despite aggravating factors, based on the same event, of a prior conviction for which a life sentence or death was possible and prior commission of a felony involving the use or threat of force); *State v. Valencia*, 132 Ariz. 248, 645 P.2d 239 (1982) (mitigating factor of age at time of offense (16) outweighed aggravating factors of prior convictions that involved the use or threat of violence and for which life sentences were imposable); *State v. Marlow*, 163 Ariz. 65, 786 P.2d 395 (1989) (court found codefendants' dramatically disparate sentence of four years imprisonment to be a significant and substantial mitigating circumstance calling for leniency, despite aggravating factors of committing murder for pecuniary gain and in an especially heinous, cruel or depraved manner); *State v. Rockwell*, 161 Ariz. 5, 15, 775 P.2d 1069, 1079 (1989) (Significant mitigating factors were: the defendant's young age at time of offense (21), his background and character (defendant was a victim in a tragic motorcycle accident, not his fault, that caused loss of a leg, serious head injuries and, later, alcoholism which, in combination, led to his need to appear macho and his violent and unpredictable behavior), his "destructive abnormally symbiotic relationship" with his brother Lewis, and his probation officer's recommendation against the death penalty because the case against defendant was based primarily on confessions made to family members (the defendant was known to brag at times about crimes he did not commit). These mitigating circumstances outweighed aggravating factor that murder was committed for pecuniary gain.); *State v. Stevens*, 158 Ariz. 595, 764 P.2d 724 (1988) (aggravating factor that murder

was committed for pecuniary gain outweighed by mitigating factor of defendant's diminished capacity to appreciate the wrongfulness of his conduct due to heavy alcohol and drug consumption the day of the killing).

*Wallace,* 160 Ariz. 424, 773 P.2d 983, also involves an emotional crime committed against a live-in-lover and her children without an apparent motive. The defendant in *Wallace* bludgeoned to death his live-in-girlfriend and her two children one at a time as they arrived home. 160 Ariz. at 425, 773 P.2d 983. We conclude, in our independent review of *Wallace,* that the murder victims were killed by surprise and relatively quickly. Further, the state in that case offered no evidence they suffered any pain. *Id.; State v. Wallace (I),* 151 Ariz. 362, 367, 728 P.2d 232 (1986). Defendant's girlfriend, on the other hand, clearly suffered intense physical and emotional pain and trauma during her forty-five minute fight for her life. *See infra* pp. 501–502, 826 P.2d pp. 798–799. The murder in this case was at least as shocking and repugnant as the murders in *Wallace,* in which we affirmed the death sentence. Thus, our comparison of this case to *Wallace* does not convince us that defendant's sentence is excessive or disproportionate.

We have reviewed cases involving facts and defendants similar to those of the present case and we find defendant's death sentence to be neither excessive nor disproportionate.

FELDMAN, C.J., and FRANK X. GORDON, Jr., J., Retired, concur in Justice CORCORAN's opinion and Justice CAMERON's special concurrence.