997 F.2d 550
 Elsie BREWER, individually and as next friend of John George
Brewer, Petitioner-Appellant,
v.
Samuel LEWIS, Director of the Arizona Department of
Corrections, et al., Respondents-Appellees,
John George Brewer, Real Party In Interest.
 No. 93-99003
 United States Court of Appeals, Ninth Circuit.
 June 22, 1993.
 
 1
 Prior Report: 989 F.2d 1021.
 
 DISSENT FROM FAILURE TO GRANT EN BANC REVIEW
 
 2
 REINHARDT, Circuit Judge, with whom Circuit Judge PREGERSON joins, dissenting:
 
 
 3
 Once again, this time almost unnoticed, a man has been executed without fair or orderly consideration of a habeas corpus petition that raises important constitutional questions. Despite the existence of substantial evidence of his incompetence, John George Brewer was permitted, without so much as an evidentiary hearing, to waive all federal court review of his potentially unconstitutional death sentence. The proceedings in both the district and appellate courts were peremptory, at best. As a result, Arizona executed Brewer on schedule, shortly after midnight on March 3, 1993. His constitutional rights remain unresolved.
 
 
 4
 There is no doubt that Brewer killed his girlfriend, Rita Brier. He did so after she told him that she loved him but would leave him so he could prove he had the strength and independence to live by himself. A few hours earlier he had burst into tears and gone off to cry in another room when she asked what he would do if she were to die. The genesis of these destructive remarks was an argument about Brewer's excessive dependency on another female--his mother. After killing his girlfriend, Brewer called the police, turned himself in, and pleaded guilty. He was twenty-two years old at the time and had no criminal record whatsoever. He did, however, have a long history of serious emotional difficulties, including a severe emotional dependency condition.
 
 
 5
 From time to time in the past, Brewer had expressed a wish to die. He had attempted suicide on a number of occasions. Although the state did not believe capital punishment to be appropriate, Brewer overcame the prosecutor's arguments for a lesser sentence and persuaded the trial judge to order his execution. Brewer then opposed every legal effort to save his life. Meanwhile, according to affidavits in the record before us, his mental condition continued to deteriorate.
 
 
 6
 The case entered the federal courts just two weeks before Brewer's scheduled execution, when his mother filed a habeas corpus petition asserting next-friend standing on the ground that her son was incompetent to represent his own interests. The petition alleged that the death sentence was imposed in violation of the Fifth and Eighth Amendments. Mrs. Brewer also claimed that Brewer's present psychiatric condition rendered the scheduled execution cruel and unusual under Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). No court ever reached the merits of her petition. It was simply dismissed for lack of standing, without even an evidentiary hearing regarding her son's competence. I believe that the peremptory dismissal was contrary to law, and that the consideration given the petition on appeal fell far short of the minimum required under any system with a fair regard for life or liberty.
 
 
 7
 Mrs. Brewer filed her petition in the federal district court on February 19, 1993, the day after Arizona state court proceedings were completed. The district court dismissed the petition for lack of standing only two working days afterwards, without issuing an opinion. A three judge panel of this court heard oral argument less than a week later. The next day, the panel, by a two-to-one vote, denied the petition only hours before the scheduled execution. The dissenting judge, William A. Norris, issued a stay to permit our court to conduct an orderly and informed en banc vote based on a careful examination of the difficult issues involved. The Supreme Court dissolved the stay without explanation. The en banc vote was then expedited, and the execution took place while the vote was in progress.
 
 
 8
 If there was even a colorable need to execute John Brewer before the court of appeals for the circuit in which the execution was to take place could give full and fair consideration to the habeas petition, and more particularly to the standing question, it is still not apparent. Brewer's case did not involve a successive petition or a lengthy federal court delay of an execution. Mrs. Brewer's was a first petition. It had been in the federal courts for only two weeks.
 
 
 9
 Although the standing issue was not a simple one, I think it clear that the panel majority decided it erroneously. There were both factual and legal questions which deserved careful exploration. None occurred. Mrs. Brewer was entitled to a full evidentiary hearing. It was not afforded her. No one--not the panel majority, the district court, or the state--contended that her claim was frivolous. Accordingly, with full appreciation of the difficult situation in which my colleagues were placed by the Supreme Court's action, I dissent from our failure to convene an en banc court.
 
 
 10
 Because we failed to convene an en banc court, to issue a stay, and to order a competency hearing, we will never know whether our constitutional system seriously malfunctioned--whether in our rush to "get on with it" we permitted an incompetent man to submit to an unconstitutional execution. All we can be certain of is that the federal courts did not fulfill their role properly and that we did not afford Mrs. Brewer's habeas petition the full and fair consideration it deserved.
 
 
 11
 I. Background.
 
 
 12
 A. State Proceedings.
 
 
 13
 By precipitously allowing Brewer to waive federal review of his potentially unconstitutional capital sentence despite substantial questions regarding his competence, the federal courts completed a remarkable process begun in the state courts. There, Brewer sought his own death sentence and, having obtained it, thereafter attempted to waive every constitutional right he had. He was in most instances successful once again. The facts of the case do not breed confidence that the waivers were wisely or lawfully permitted. Rather, they reveal a man whose competence to waive his rights was in serious doubt from the very beginning.
 
 
 14
 Brewer pled guilty in July of 1988, against the advice of his appointed counsel and without attempting to obtain an agreement as to sentencing. The court had previously found the defendant competent to enter a plea based on a colloquy with him and on reports authored by Dr. Michael Bayless, a clinical psychologist specializing in forensic psychology, and Dean Gerstenberger, M.D.[1] Dr. Bayless later retracted his report and still later determined that Brewer had not been competent at the time of the plea or of the crime. See infra pp. 554, 556.
 
 
 15
 At his sentencing hearing, Brewer not only sought the death penalty, but told the court that he had had sexual intercourse with Brier's corpse. Medical evidence and expert testimony suggest that he may well have lied about the act of necrophilia. See State v. Brewer, 170 Ariz. 486, 826 P.2d 783, 799 (1992), cert. denied, --- U.S. ----, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). Brewer also objected to the presentation of mitigating evidence, but the jail pastor and Dr. Bayless were nevertheless permitted to testify. The pastor told the court that Brewer had expressed bewilderment and remorse over the killing. Dr. Bayless testified that Brewer suffered from Borderline Personality Disorder, exhibited a dependency on his mother, and had a phobia of being alone. He stated further that Brewer had developed a "pathological dependency" on Brier, and that when she told him that she intended to leave him, Brewer's capacity to formulate reasonable solutions to his problems became impaired, and he lashed out in anger and killed her.[2] However, based on the limited scientific data then available on Borderline Personality Disorder, Dr. Bayless concluded that Brewer was legally competent, was oriented to reality, and possessed the capacity to appreciate the difference between right and wrong.
 
 
 16
 Relying in part on Brewer's dubious necrophilia testimony, the trial court found that the murder was committed in an especially heinous, cruel and depraved manner, and sentenced him to death. Brewer attempted to waive appellate review, but Arizona law mandates direct review of capital cases in the state supreme court. The Arizona high court completed that review approximately three and a half years later, on January 28, 1992. See State v. Brewer, supra. A petition for certiorari to the U.S. Supreme Court filed without Brewer's knowledge was denied on October 5, 1992.
 
 
 17
 The Clerk of the Arizona Supreme Court then submitted an automatic Notice of Post-Conviction Relief to the trial court on November 6, 1992. In response to the Notice, the trial court undertook a series of extraordinary actions. First, it issued a minute entry scheduling a "pre-hearing conference" for November 23, 1993. Then, at the "conference," without prior notice to appointed defense counsel and without hearing evidence, the trial judge found Brewer competent to represent himself, excused appointed counsel, granted Brewer's motion to waive post-conviction review, and dismissed "the Rule 32 Petition [for post-conviction relief]" even though no such petition had yet been filed.[3] That concluded the state-initiated proceedings, and precipitated Mrs. Brewer's entry into the case as a next friend.
 
 
 18
 On December 8, 1992, Elsie Brewer filed a Motion for Rehearing of Post-Conviction Rulings in the state trial court. She alleged that her son was not competent to waive his right to post-conviction review of his guilty plea and sentence. The trial court, again without a hearing, issued a two-sentence Minute Entry denying her motion on January 19, 1993. Mrs. Brewer then quickly exhausted her state post-conviction remedies by filing a new Petition for Post-Conviction Relief in the trial court on January 26, 1993, a Motion for Stay of Execution in the Arizona Supreme Court on February 3, 1993, and a February 10, 1993 Petition for Review by the Arizona Supreme Court of the trial court's post-conviction rulings of November 23 and January 19. The Motion for Stay was denied on February 18, 1993.[4] No hearings were held in connection with any of these filings.
 
 
 19
 In the meantime, on December 17, 1992, the Arizona Supreme Court issued a death warrant directing that Brewer be executed on March 3, 1993.
 
 
 20
 B. Federal Proceedings.
 
 
 21
 Although the Arizona Supreme Court waited over four years to issue a warrant scheduling Brewer's execution, by the time the state courts completed collateral review of the case, only two weeks remained before the March 3 execution date. The federal courts were thus forced to choose between issuing a stay in order to permit a fair and orderly review of the petition or compressing all three levels of federal court proceedings into a two week period. Unfortunately, we chose the latter course. The habeas petition was filed in federal court on the 19th of February; proceedings in the district court were completed by the 23rd; and the full range of federal appellate review was squeezed into the eight days remaining before the execution. Consideration of en banc action on Mrs. Brewer's petition was limited to the last few chaotic hours. Wholly aside from the manner in which federal courts at other levels handled the matter, it should be apparent that a few hours was not sufficient time to permit the 27 judges of our court to perform their en banc duties in an orderly manner or to cast informed votes on the issues before us.
 
 
 22
 Although the federal proceedings on Mrs. Brewer's petition were hurried beyond all decency, they were not simple. They involved a confusing and arcane threshold procedural question as to which the law is far from settled. The question was whether Mrs. Brewer had standing to assert her son's constitutional rights. It deserved far more thorough and careful examination than it received.
 
 
 23
 Whether Mrs. Brewer had standing depended entirely on whether her son was competent. The two questions were coterminous. All parties agree that Mrs. Brewer could only assert her son's rights in federal court if Brewer was in fact not competent to represent himself. See Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The specific issues were: what constitutes adequate evidence of incompetence, and, even more important as it turned out, what type of showing is necessary to warrant an evidentiary hearing? The latter question proved crucial because if Mrs. Brewer could make the requisite showing, a full and fair competency hearing would be required.
 
 
 24
 Mrs. Brewer adduced impressive documentary evidence of her son's incompetence. Among the exhibits attached to the petition were: an affidavit from forensic psychiatrist Bob Rollins, which stated his "medical certainty" that Brewer was not currently competent to participate in legal proceedings;[5] an affidavit from Dr. Bayless, in which he stated that "treatment must be undertaken before [Brewer] will be able to make competent decisions that are not fueled by his self-destructive desire to be killed," and withdrew his 1988 opinion that Brewer was competent to participate in legal proceedings, in part because Brewer had "deteriorated substantially" since his 1988 sentencing;[6] accounts of Brewer's several suicide attempts;[7] and letters written from death row in which Brewer expressed his religious beliefs in two deities, the God "Dantain" and the man-Elf "Fro," who together rule over a planet called "Terracia." More unsettling, the letters express Brewer's belief that Fro had been incarnated on earth as Brewer's murdered girlfriend, Rita Brier.[8] Finally, according to an affidavit from Brian McKee, a high school friend of Brewer's, the condemned man believed that he would rejoin Rita-Fro on Terracia after his execution. Probably because Brewer has waived his rights and fought for the imposition and implementation of his death sentence throughout the proceedings, no one has suggested that the letters represent an attempt to fabricate indications of mental illness.
 
 
 25
 On the evening of the day on which the federal habeas petition was filed, a Friday, the district court scheduled a hearing regarding Mrs. Brewer's standing to proceed on her son's behalf for the following Tuesday, February 23, 1993. The court was not moved by Mrs. Brewer's objection that, because the state had not afforded her experts an opportunity to examine her son in person, it would be impossible to prepare adequately for an evidentiary hearing on such short notice. On the morning of the hearing, in a belated attempt to redress the problem created by Mrs. Brewer's lack of access, the district court ordered that Brewer be made available for an examination by her mental health experts. However, the court refused to postpone the hearing scheduled for 1:30 that afternoon, and thus deprived Mrs. Brewer of any meaningful opportunity to take advantage of its order.
 
 
 26
 At the hearing itself, the court again denied a request for a continuance to permit the petitioner to conduct the discovery that it had authorized. After considering the evidence that Mrs. Brewer was able to present without benefit of a medical examination of her son or other discovery, the court remarked that "the life of John Brewer has been one that has continuously been involved with mental disturbances and mental episodes that have led to the suicidal ideation and [suicide] attempts that have been referred to...." Tr. at 109-110. The court nevertheless orally dismissed the petition on standing grounds. Specifically, the court found that Mrs. Brewer had no standing because she had failed to sustain "her burden of proving by clear evidence" that her son suffered from an "inability to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation."
 
 
 27
 The next day, Wednesday, February 24, Mrs. Brewer filed a notice of appeal to this court, and the district court denied her application for a certificate of probable cause. Appellate argument was scheduled in Pasadena for the following Monday, March 1, 1993, at 3:30 p.m. At this point, the pace of the proceedings accelerated from rapid to breakneck. At 2:48 p.m. on March 2--less than 24 hours after the argument and approximately eight hours before the scheduled execution--the panel majority issued its thirteen page order and opinion denying a certificate of probable cause and a stay of execution. Judge Norris simultaneously filed a thirteen page dissent, and the majority amended its opinion two hours later. Between the filing of the first and second majority opinions, Judge Norris issued his call for en banc review and the one-judge order in which he granted the certificate of probable cause and stayed the execution pursuant to 28 U.S.C. § 2251.[9]
 
 
 28
 Most of us assumed that our normal en banc procedures governing first petitions in capital cases would apply to Judge Norris' en banc call. Those procedures provide for a period for circulating memoranda prior to the commencement of voting.[10] However, about 9:30 p.m. Pacific time, a scant one and a half hours before the scheduled execution (11:01 p.m. Pacific time, 12:01 a.m. Arizona time), the Clerk of our court began calling the judges wherever they could be found to inform them, first, that the Supreme Court had vacated Judge Norris' stay, second, that a Petition for Rehearing, Suggestion for Rehearing En Banc and Motion for Stay from the En Banc Court had been received, and third, that they were requested to vote forthwith on the Suggestion and Motion for Stay, or on Judge Norris' en banc call, it is not entirely clear which, probably on both.
 
 
 29
 The Petition and Suggestion was faxed to my chambers at 9:44 p.m. Pacific time--an hour and a quarter before the scheduled execution--and then re-faxed by my law clerk to Seattle, where I was hearing cases. It contained an important new affidavit from Dr. Bayless which summarized his testimony before the Arizona Board of Pardons. The Board of Pardons had met early that very morning to consider whether to grant a reprieve in Brewer's case. Bayless appeared before the Board and testified to his revised opinion that Brewer was not legally competent either at the time of the crime or when he pled guilty in 1988. He explained that he had changed his mind based on (1) "a virtual explosion" of new scientific evidence regarding the potential severity of Borderline Personality Disorder, a malady which uncontestedly has afflicted Brewer since long before the commission of the crime, and (2) additional social history on Brewer. After hearing the testimony, the Board voted, by the barest of margins, 4 to 3, to deny a reprieve.
 
 
 30
 The conditions surrounding our consideration of the Petition and Suggestion were as far from conducive to rational judgment as I can imagine. The Supreme Court's reasons for vacating the stay were and are a mystery. We had no information as to whether the Court acted because a majority of the Justices disesteems one-judge stays in capital cases, as some of us have been strongly led to believe,[11] or whether it had some other procedural or substantive objection in mind. Certainly, we could not determine definitively from the Court's order whether it agreed with the panel majority on the merits of the standing question. When we received the Petition and Suggestion, the 27 active judges of our court were scattered over several states. Many were away from their chambers hearing oral argument. Most of those who were not away from their regular chambers had gone home. Faxing the judges the two-foot-high mound of papers filed by the parties was not feasible, and even if it had been, there would have been no time to study them. There was also no time for legal research, no time to call for a response from the state, no time to consult with colleagues, no time to read cases, and precious little time even to review the Petition and Suggestion itself. Several judges could not be reached at all. We voted anyway. Although the vote was never completed, Brewer's execution was carried out on schedule. The en banc call would have failed in any event.
 
 
 31
 As I have stated elsewhere, I greatly regret the existence of a circuit rule that prevents me from disclosing the tally of our votes on Suggestions for Rehearing En Banc. See Harris v. Vasquez, 949 F.2d 1497, 1539 (9th Cir.1990) (Reinhardt, J., dissenting from the denial of en banc review); Elder v. Holloway, 984 F.2d 991, 1000 (9th Cir.1993) (same). However, I think it consistent with our rules to say this much: a majority of our court either voted no or abstained (an abstention counts as a no vote); several judges could not be reached at all; and a substantial number voted yes. So that there will be no misunderstanding, I emphasize that the Clerk's inability to reach certain judges did not affect the outcome of the vote--the vote would have failed even if the judges who were not reached had all voted in the affirmative.
 
 
 32
 Although I thought en banc review was clearly warranted, when a staff attorney advised me that the Supreme Court had vacated Judge Norris' stay, and asked for my immediate vote on an en banc call, one that if successful would result in the issuance of another stay, I cast that vote with great reluctance. I thought it extraordinary that I was required to vote on so important a matter while ignorant of the reasons for the Supreme Court's action. I am certain that the others who voted in the affirmative shared my concerns.
 
 
 33
 One final point deserves comment before I turn to the legal issues: it should be absolutely clear from the above discussion that Mrs. Brewer did not abuse the Great Writ by submitting the first and only habeas corpus petition ever filed on her son's behalf. She acted most expeditiously. Her concern was that her son's constitutional claims be heard. As long as the Arizona courts were engaged in "automatic" review of his case, there was no reason for her to take action in those courts, and there was no legal basis for bringing her son's yet unexhausted claims to federal court. Two weeks after the automatic notice of post-conviction proceedings was dismissed by the Arizona trial court, and before any execution date had been set, Mrs. Brewer moved for reconsideration of the dismissal. When her motion for reconsideration was denied, she promptly pursued the state collateral remedies that were open to her. Mrs. Brewer came to federal court the very day after the Arizona Supreme Court denied her motion for a stay of execution. It would have been improper and pointless for her to do so any sooner. To their credit, neither the state nor the panel contended that Mrs. Brewer was guilty of dilatory tactics, undue delay, or any other form of abuse of the writ.
 
 
 34
 II. Analysis.
 
 
 35
 I dissent from the court's refusal to review the panel decision en banc for two reasons. First, the panel erred by failing to apply a Ninth Circuit rule which requires the issuance of a certificate of probable cause and an "automatic" stay of execution pending final resolution of the first habeas corpus petition filed in a capital case. Second, and independent of the automatic stay rule, the panel erred in affirming the dismissal of Mrs. Brewer's petition on standing grounds instead of remanding for an evidentiary hearing on Brewer's competence and staying the execution in the meantime. Because both errors operated to prevent full appellate consideration of a potentially unconstitutional execution, and because both will affect the court's review of future capital cases, both were worthy of en banc review.
 
 
 36
 A. The panel was obliged to stay the execution under our Circuit Rules.
 
 
 37
 Although Judge Norris acted entirely within his authority in issuing a one-judge stay, he should not have been forced to act alone in order to protect the integrity of our en banc process. Under Circuit Rule 22-3, the panel should have "automatically" granted a stay to Mrs. Brewer because hers was a first and not a successive habeas corpus petition. Whether the Supreme Court would have vacated a mandatory stay issued by a panel pursuant to Circuit Rules as readily as it vacated Judge Norris' one-judge stay is uncertain. In any event, the panel clearly erred by not issuing the stay required by the rule.
 
 
 38
 Circuit Rule 22-3(c) provides for an automatic stay upon application by a petitioner appealing the denial of the first habeas corpus petition filed in a capital case:
 
 
 39
 On the first petition ... upon application of the petitioner a certificate of probable cause will be issued and a stay of execution will be granted by the special state death penalty panel pending the issuance of its mandate.
 
 
 40
 (emphasis added). The Rule's definition of the term "first petition" clarifies that the petition need not be filed by a condemned prisoner:
 
 
 41
 A "first petition" for habeas corpus shall mean: the original filing relating to a particular conviction or sentence....
 
 
 42
 Circuit Rule 22-3(a) (emphasis added).
 
 
 43
 Mrs. Brewer clearly qualifies as a "petitioner" under the Rule. She filed a habeas corpus petition under 28 U.S.C. § 2254. The petition was the first and only federal court filing "relating to" Brewer's conviction or sentence. Yet the panel majority refused to grant Mrs. Brewer's application for an automatic stay on the ground that Rule 22-3 may not be invoked by a next-friend petitioner until after he or she has established next-friend standing. The panel's view clashes with both the plain meaning and the purpose of the Rule. The Rule provides for an automatic stay upon application of a "petitioner," not upon application of a "defendant" or a "condemned prisoner." The 28 judges who participated in the drafting and adoption of Rule 22-3 were well aware of the difference. Next-friend petitioners come regularly to our court. They are not a strange and unexpected breed of litigant whom the panel could assume we failed to consider in drafting our rules. The Rule's use of the inclusive term "petitioner" should therefore be taken at face value.
 
 
 44
 More important, as this case demonstrates, determining the standing of a next-friend petitioner can be a difficult task. The very purpose of Rule 22-3 is to ensure that, at least with respect to the first habeas petition filed in a capital case, such difficult decisions are not made under "the hydraulic pressure of an impending execution." Brewer v. Lewis, 989 F.2d 1021, 1028 (9th Cir.1993) (Norris, J., dissenting). Moreover, the purpose of the rule is not fulfilled, nor is the obligation to apply it excused, simply because a majority of a particular panel believes itself capable of deciding a case in the time remaining before an execution. The automatic stay rule exists not only to prevent three-judge panels from rushing to judgment, but also to allow the court as a whole a reasonable opportunity to consider the decisions of three-judge panels, including decisions on standing. That is why Rule 22-3 provides for a stay not just until the panel issues its decision, but until the court's mandate issues.[12] Rule 22-3 thus guarantees that final authority over the first habeas petition filed in a capital case lies with the court as a whole, should it choose to exercise that authority, not with three-judge panels. The panel, by taking to itself the final authority to determine the standing issue, frustrated this court's will as embodied in its rules.
 
 
 45
 Citing the Supreme Court's brief per curiam opinion in Demosthenes v. Baal, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990), the panel sought to justify its refusal to follow the court's rules by asserting that it was without power to issue a stay because Mrs. Brewer lacked standing. See Brewer, 989 F.2d at 1024. However, the threshold question of standing was, as is explained above, for the full court to consider at its option, not for the panel to resolve finally. Under well-established law, the panel clearly had the power to stay the execution so that the full court could determine the standing question.
 
 
 46
 Standing is a jurisdictional question. In the case of Mrs. Brewer, the answer to the standing question was dispositive of the question of whether our court had jurisdiction over her petition. Courts have always had jurisdiction to answer such questions--to determine their own jurisdiction. A necessary corollary is that courts have always had the power to prevent a case from becoming moot as the result of a threatened action by a party while they are in the process of determining their own jurisdiction. See United States v. United Mine Workers of America, 330 U.S. 258, 290, 67 S.Ct. 677, 694, 91 L.Ed. 884 (1947) (district court "unquestionably had the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction").[13] Indeed, the Supreme Court has held expressly that courts have Article III power to stay an execution while the issue of jurisdiction is being determined. See United States v. Shipp, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906).[14] Under familiar principles of toe-hold jurisdiction, then, the panel unquestionably had power to stay Brewer's execution until the question of his mother's standing could be determined by the full court under our rules.
 
 
 47
 Our Circuit Rules obviously cannot create jurisdiction where none would otherwise exist, but they can allocate what power we do have between the entire court and its representative three-judge panels. Because Mrs. Brewer's was a first habeas petition, our rules vested final authority on the question of her standing in the court as a whole, and required the panel to stay the execution until the full court had been afforded an opportunity to review the panel's initial determination. Such an allocation of power and responsibility was entirely proper. Neither Article III nor any act of Congress requires the circuit to vest our toe-hold jurisdictional power, or the concomitant power to issue a temporary stay, in three-judge panels exclusively. Accordingly, the panel had both the power and the obligation to stay the execution until the full court had had an opportunity to consider whether jurisdiction existed over Mrs. Brewer's petition. Its failure to do so was in violation of the rules of this court.
 
 
 48
 Demosthenes v. Baal is not to the contrary. Baal only states the truism that a stay of execution may only be granted where an "adequate basis" exists for the exercise of federal power. 495 U.S. at 737, 110 S.Ct. at 2226. It does nothing to change the longstanding rule that a court's need for time in which to determine a substantial question regarding its jurisdiction constitutes an "adequate basis" for issuing a temporary stay. The opinion neither cites nor discusses Shipp or Mine Workers. It is inconceivable that the Court intended to overrule these decisions sub silentio in the Baal per curiam.[15] The panel's conclusion that Baal precluded it from complying with Circuit Rule 22-3 was clearly in error.
 
 
 49
 B. The panel was required to stay the execution pending the completion of an evidentiary hearing on Mrs. Brewer's standing.
 
 
 50
 Entirely apart from its obligations under our circuit rules, the panel erred in failing to stay the execution and failing to order that an evidentiary hearing be held on the question of Mrs. Brewer's standing. In the absence of such a hearing, the court could not properly determine Brewer's competency. Accordingly, it could not determine Mrs. Brewer's standing.
 
 
 51
 As the panel acknowledged, a defendant's competence to waive review of his conviction or sentence depends on:
 
 
 52
 whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.
 
 
 53
 Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966), cited in Brewer at n. 4. The ability to make a "rational" choice about terminating litigation entails more than a cognitive appreciation of one's factual position and the ability to make a logical choice between alternatives; it also requires that a defendant reason from premises or values that are within the pale of those which society accepts as rational. See Smith ex rel. Mo. Public Defender Comm'n v. Armontrout, 812 F.2d 1050, 1057 (8th Cir.1987), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987).
 
 
 54
 While the applicability of the Rees standard is clear, the petitioner's burden of proof under that standard is not. Whitmore v. Arkansas states that "[t]he burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court." 495 U.S. at 164, 110 S.Ct. at 1727 (emphasis added). Yet the Supreme Court followed this statement with a citation to Groseclose ex rel. Harries v. Dutton, 594 F.Supp. 949, 952 (M.D.Tenn.1984), which explicitly used a preponderance of the evidence standard. We need not ponder the subtleties of the Supreme Court's Whitmore analysis, because both Groseclose and Whitmore dealt with the quantum of proof required to prevail at a competency hearing, not the preliminary showing necessary to obtain one. Here, no competency hearing was held, and the issue is simply whether Mrs. Brewer's evidence entitled her to such a hearing.[16] As to that question, Whitmore is silent. Indeed, no federal court, the Brewer panel included, has definitively stated what is necessary to obtain a plenary evidentiary hearing on a defendant's competence to waive collateral review of his case. If only because Mrs. Brewer's petition raised this complex question of first impression, the panel's dismissive treatment of her petition was ill-advised and improper.
 
 
 55
 In the absence of precedent that is precisely on point, I assume the showing necessary to obtain an evidentiary hearing on a defendant's competence to waive review of his conviction or sentence is the same as that required to obtain a hearing on a defendant's competence to stand trial. See Card v. Singletary, 981 F.2d 481, 484 n. 5 (11th Cir.1992) (equating the two standards). In the latter context, we have required an evidentiary hearing if "a reasonable judge, situated as was the trial court judge [ ], should have experienced doubt" with respect to the defendant's competence. De Kaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir.1976) (en banc), cert. denied, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977); see also Card, 981 F.2d at 485 (hearing must be held if evidence creates "legitimate and substantial doubt" as to defendant's competence). Such a doubt may of course be raised by evidence which would not itself carry the burden of proving a defendant's incompetence; the question instead is whether evidence has been adduced which warrants further inquiry into the defendant's competence to effect a waiver. See Bailey v. Spears, 847 F.2d 695, 696 (11th Cir.1988) (remanding for an evidentiary hearing where petitioner's evidence "justif[ied] further inquiry by a competent medical expert"). Finally, for purposes of assessing whether a legitimate doubt has been created, petitioner's evidence is presumed true and is not weighed against the state's evidence. See Card, 981 F.2d at 484-85. Weighing and credibility assessments must await an actual evidentiary hearing.[17]
 
 
 56
 The panel did not discuss this standard or dispute that Mrs. Brewer's evidence gave rise to a genuine doubt about whether her son's decision to waive review of his death sentence derived from a value or premise that society would accept as rational. The panel instead held that her request for a federal court evidentiary hearing, like her request for a stay, was foreclosed by Demosthenes v. Baal. In so holding, the panel once again misapplied Baal.
 
 
 57
 In Baal, the Court concluded that a recent state court finding that the condemned defendant was competent to waive post-conviction review of his death sentence obviated the need for a federal court evidentiary hearing on that question. The Court's conclusion rested on two crucial factors. First, in Baal, the state court made its finding of competence after a full and fair evidentiary hearing held only one week before the federal habeas petition was filed. 495 U.S. at 734, 110 S.Ct. at 2224-25. Second, the petitioners in Baal did not present any "meaningful evidence" of their son's incompetence in the district court that had not been presented at the state court hearing. Id. at 736, 110 S.Ct. at 2226. For those two reasons, the Court concluded that the state court finding of competence was entitled to a presumption of correctness under 28 U.S.C. § 2254(d), that there was no evidence in the record that served to overcome the presumption, and that, therefore, no federal court evidentiary hearing was required as to Baal's competence. Accordingly, it determined that the execution could proceed.
 
 
 58
 Neither of the factors upon which the decision in Baal is based is present here. As a result, Baal is inapplicable, and the panel's decision rests on a clear error of law.
 
 
 59
 In Brewer's case, the Arizona courts never held any evidentiary hearing--let alone a full and fair hearing--on the defendant's competence to waive post-conviction proceedings. While Baal was found competent after a full and fair evidentiary hearing conducted approximately one week before his case reached the federal district court, Brewer was permitted to waive post-conviction proceedings at the state trial court's November 23, 1992 "preliminary conference." The judge provided no notice whatsoever that he planned to reach the question of competence at the conference; consequently, Brewer's appointed counsel was not prepared to present evidence on the date in question, and almost none was heard. The only evidence offered was the affidavit of Dr. Rollins, which defense counsel happened to have with her. No presumption of correctness attaches to state court findings made by means of such irregular procedures. See 28 U.S.C. § 2254(d)(6).
 
 
 60
 The only other state court hearing on Brewer's competence was conducted over four years earlier, and concerned an entirely different factual matter than the one presented here. The July 1988 hearing concerned Brewer's competence to enter a guilty plea at that time--it did not purport to predict Brewer's future competence to waive post-conviction proceedings four years later, and it deserves no deference on that question. Particularly in light of Brewer's deteriorating mental condition, the majority's deference to this four year old finding of an entirely different fact is difficult to comprehend. See Lafferty v. Cook, 949 F.2d 1546, 1550 n. 2 (10th Cir.1991) (treating findings of defendant's competence and incompetence rendered two years apart as separate and distinct), cert. denied, --- U.S. ----, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992); Smith By and Through Smith v. Armontrout, 626 F.Supp. 936, 939 (W.D.Mo.1986) (ordering federal hearing where state court finding of competence was sixteen months old). Further, the July 1988 finding was based on reports submitted by two experts, one of whom (Dr. Bayless) has since retracted his opinion of competence. The retraction of half of the expert foundation for the original finding of competence alone would have been sufficient to strip it any presumption of correctness under § 2254(d). See Spitzweiser-Wittgenstein v. Newton, 978 F.2d 1195, 1197-98 (10th Cir.1992) (reversal of opinion of only expert witness who testified at competency hearing stripped state court finding of its presumption of correctness). Thus, there was no full, fair, and adequate state court finding as to Brewer's competence, and Baal does not control the outcome of Brewer's case.
 
 
 61
 Even, however, if one were to assume that the state court proceedings were full, fair, and adequate, Mrs. Brewer would be entitled to a federal court evidentiary hearing because she presented the district court with "meaningful evidence" of her son's incompetence that had never been considered in a state court evidentiary hearing. The panel determined Mrs. Brewer's evidence to be less than meaningful, finding it "indistinguishable" from the new evidence submitted to the district court by the next-friend petitioners in Baal. In fact, the new evidence Mrs. Brewer submitted to the district court was of an entirely different order from that presented in Baal.
 
 
 62
 In Baal, the petitioners presented the district court with a single "conclusory" affidavit that was "lacking in foundation or substance" from a psychiatrist who had never interviewed the defendant and asserted only that the defendant "may" not be competent. 495 U.S. at 736, 110 S.Ct. at 2225. By contrast, here, Dr. Bayless had previously examined the defendant, and he clearly expressed his reasoned view that Brewer was unable to make competent decisions regarding his execution: "John Brewer has long been suffering from a major depressive disorder.... treatment must be undertaken before he will be able to make competent decisions that are not fueled by his self-destructive desire to be killed." Moreover, although Dr. Rollins had never examined Brewer in person, his exhaustive documentary review of the case led him to an unequivocal conclusion. He stated to a "medical certainty," that Brewer was not competent to represent his own interests in legal proceedings. Finally, the views of Drs. Bayless and Rollins were corroborated by Brewer's letters from death row. The letters and the supporting affidavit detail Brewer's belief that after his execution he would be re-united with his murdered girlfriend, in her true incarnation as a man-Elf deity, on the planet Terracia. Such behavioral evidence can alone be sufficient to require an evidentiary hearing on a defendant's competence. See Bailey, 847 F.2d at 696 (remanding for an evidentiary hearing in light of bizarre behavior, a history of suicide attempts, and opinion of psychologist with undergraduate degree that further examination would be "advisable").
 
 
 63
 None of the evidence submitted to the district court by Mrs. Brewer was considered at a full and fair state court evidentiary hearing, and with the exception of the Rollins affidavit, none of it was considered at a state court hearing of any kind. Mrs. Brewer's evidence was sufficient to raise a "genuine doubt" as to whether Brewer's waiver was "substantially affected," Rees, supra, by suicidal impulses or other conditions born of his personality disorder or emotional instability. Accordingly, it constituted "meaningful evidence" of incompetence requiring an evidentiary hearing. Whatever standard the federal courts may ultimately arrive at, the evidence offered by Mrs. Brewer is more than sufficient to warrant a competency hearing. In fact, if no contrary evidence were introduced, Mrs. Brewer's evidence would require a finding that her son was incompetent and that she therefore had standing to seek habeas relief. The panel's failure to distinguish the substantial evidence submitted by Mrs. Brewer from the solitary, equivocal, and conclusory affidavit in Baal was grossly in error.
 
 
 64
 In sum, the state court proceedings on Brewer's competence to waive post-conviction review of his death sentence were neither full nor fair, and, in light of the meaningful evidence submitted to the district court by Mrs. Brewer, plainly failed to render a federal court evidentiary hearing unnecessary. To the contrary, Mrs. Brewer's evidence at the very least raised a substantial doubt as to her son's competence to waive his right to federal review of his death sentence. Accordingly, she was entitled to a full evidentiary hearing on that question in the district court. The panel erred in not ordering the district court to conduct such a hearing and in failing to issue a stay of execution in the interim.
 
 
 65
 The panel having seriously erred both with respect to its obligations to comply with our rules governing stays and the district court's obligation to conduct a full and fair competency hearing, I believe that action by an en banc court was required.
 
 
 66
 C. The Petition for Rehearing.
 
 
 67
 The Petition for Rehearing and Suggestion for Rehearing En Banc presented an additional reason why we should have granted en banc review and an en banc stay of execution. An affidavit attached to the Petition, which we received about five hours after the filing of the majority opinion and less than two hours before the scheduled execution, informed us of Dr. Bayless' testimony that morning before the Arizona Board of Pardons. The affidavit expressed Dr. Bayless' revised opinion, based on new scientific evidence of the significance of Brewer's Borderline Personality Disorder, that Brewer was not legally competent either at the time of his guilty plea or at the time of the crime. Bayless' testimony persuaded three of the seven members of the Arizona Board of Pardons to vote for a reprieve. I can conceive of no reason why this evidence would not at a minimum have entitled Mrs. Brewer to an evidentiary hearing on her son's competence to waive federal review of his case, if not on his competence to plead guilty to or even to commit the crime of first degree murder--and to this moment no court or judge has explained why it did not, standing alone, meet the applicable standard. I very much regret that Dr. Bayless' evidence never received the careful attention which it deserved from our court, and which it would have received had a stay been issued by the panel and not dissolved by the Supreme Court.
 
 
 68
 III. Epilogue.
 
 
 69
 Although with a full opportunity to research the law I find the legal issues quite clear, I do not wish to be understood as offering criticism of those of my colleagues who voted against en banc review. Under the circumstances, it would be unfair to impute credit or blame on the basis of how any of us voted on the night of Brewer's execution. Our court did its best under the most adverse conditions. It is regrettable that capital punishment cases are being decided by means of such injudicious procedures. However, in the end, the fault is certainly not that of my colleagues.
 
 
 70
 There is one final matter that should be addressed. The view has been expressed in some quarters that the Ninth Circuit is populated by a group of vigilante judges who oppose capital punishment and follow their personal predilections instead of the law in death penalty cases. Nothing could be further from the truth. In capital cases no less than in other cases, the judges of this court act not on the basis of their personal views but on the basis of their understanding of their oath of office and of the requirements of due process of law. In some cases that will lead some of us to vote to stay an execution. Others will be led to vote a contrary way. That is not surprising--the requirements of due process are frequently a matter of dispute, and even of heated controversy, in capital and non-capital cases alike. No one should doubt, however, that all of the members of this court will follow the clearly expressed directives of the Supreme Court, no matter how offensive they may be to the sensibilities or constitutional understandings of individual judges. Here, there were no directives of any kind, either before or after the Supreme Court issued its one-sentence order dissolving Judge Norris' stay. The order did not advise us that Mrs. Brewer's petition should be dismissed or that her son should be executed without an evidentiary hearing as to his competence. In fact, as research has revealed, it is most unlikely that such was the Court's intent since the law is quite plainly to the contrary.
 
 
 71
 The judge of our court who unsuccessfully stayed the execution, and those who voted in favor of en banc review, acted in accordance with their understanding of existing law. Both the stay and the votes in favor of en banc review represented attempts to restore a modicum of order to the process of adjudicating a condemned man's constitutional rights--to the process of determining an individual's competence to waive federal review of a potentially unconstitutional death sentence. I regret that these efforts to allow the members of this court to consider the matter in an orderly fashion failed.
 
 
 72
 I trust that this dissent will, at the very least, serve to establish an objective factual record of the events that transpired in John Brewer's case. This is but another chapter on the basis of which history will form its ultimate judgment of the judiciary's performance in capital cases. There can be little doubt what its conclusion will be. As an institution, we have sorely failed.
 
 
 73
 For the reasons expressed above, I respectfully but most vigorously dissent from the court's failure to grant en banc review.
 
 
 
 [1]
 In lieu of a hearing, the parties stipulated that Brewer's legal competence would be determined on the basis of reports filed with the court by Bayless and Gerstenberger
 
 
 [2]
 Specifically, Dr. Bayless testified that:
 ... this young man had developed a pathological dependency on a person who--who had told him that they were going to separate, and from that point, that is where the string actually broke, in which then his judgment--because judgment is very much impaired with this disorder. Under stress, his foresight, his insight, his willingness to look at reasonable solutions, his willingness to--to have some dependency on himself and depend on himself for his own needs, became extremely impaired and distorted. At that point his only out was that, and we also see anger with this disorder. You see the lashing out of anger with this disorder.
 
 
 [826]
 P.2d at 802
 
 
 [3]
 Only Dr. Rollins' affidavit, which defense counsel happened to have with her, was submitted at the "conference."
 
 
 [4]
 The record does not reveal the disposition of the January 26 petition filed in the trial court
 
 
 [5]
 Dr. Rollins is a Clinical Professor of Psychiatry at the University of North Carolina at Chapel Hill, a Lecturer in Psychiatry at Duke Medical Center, and the Director of the Forensic Division at a Raleigh hospital. His affidavit was based on "psychiatric reports, trial testimony, Mr. Brewer's presentence report, school records, recent letters written by Mr. Brewer to the court, and Mr. Brewer's taped statements." The affidavit states that Brewer's mental disorder "prevents him from conducting his affairs in a rational manner and making reasoned choices in the pending legal proceedings." Rollins further stated that "Mr. Brewer's isolation and alienation in prison for the last five years has exacerbated his mental illness and increased his suicidal ideation." He concluded that "to a reasonable medical certainty [ ] Mr. Brewer is not competent to participate in legal proceedings at the present time."
 
 
 [6]
 Dr. Bayless' affidavit was based on his 1988 examination of Brewer and on a review of materials made available to him after Brewer's incarceration. He stated, inter alia:
 Based upon my review of these records, which also included a substantial number of background materials that I did not have access to in 1988, it is my opinion that John Brewer has long suffered from a major depressive disorder.
 It is also my opinion to a reasonable scientific or psychological certainty that Mr. Brewer's condition has deteriorated substantially since the time of his sentencing in 1988.
 I am now convinced that Mr. Brewer's desire to be executed is product [sic] of the psychotic features of his depression. After reviewing the previously unavailable background materials and reading about Mr. Brewer's current continued attempts to be executed, I no longer believe, as I did when I evaluated Mr. Brewer in 1988, that his purported desire to be executed is an attempt by him to manipulate the court into finding him incompetent.
 There are grave and substantial questions raised by the records I have reviewed as to Mr. Brewer's ability to make competent decisions with respect to the waiver of his appeal.
 [T]reatment must be undertaken before he will be able to make competent decisions that are not fueled by his self-destructive desire to be killed.
 District Court Exhibit 1.
 
 
 [7]
 E.g. District Court Exhibit 3
 
 
 [8]
 The letters include the following statements:
 "I am the one who killed Fro, the savior of Terracia."
 "[Fro would] become a man elf when we got to Terracia. However, I knew her ... only as a woman."
 "Dantain told me I would be executed in 1-7 years."
 "I keep finding myself praying to Christ to forgive me for worshipping other Gods."
 "I killed Fro because she was going to follow Dantain's command for me to live separate of (not from) her, and I didn't want to."
 Dist.Ct.Exh. 5.
 
 
 [9]
 28 U.S.C. § 2251 provides: "A justice or judge of the United States before whom a habeas corpus proceeding is pending, may, before final judgment or after final judgment of discharge, or pending appeal, stay any proceeding against the person detained in any State court or by or under the authority of any State for any matter involved in the habeas corpus proceeding."
 
 
 [10]
 Although our en banc rules governing first petitions provide for such an exchange period, there was some initial administrative confusion within the court. As a result, between five and nine o'clock p.m., several judges prematurely cast votes on Judge Norris' en banc call
 
 
 [11]
 Our Circuit Justice publicly expressed her disapproval of one-judge stays in a speech at the 1992 Judicial Conference. The Recorder, May 25, 1993 pp. 12-13
 
 
 [12]
 The mandate in a case issues only after the entire court has had a sufficient opportunity to review a panel's decision and to call for amendment by the panel or rehearing by an en banc court
 
 
 [13]
 See also 17A Wright, Miller, & Cooper, Federal Practice and Procedure, § 3537 at 543 & n. 9 (1984); Nat. Maritime Union v. Aquaslide 'N' Dive Corp., 737 F.2d 1395, 1399 (5th Cir.1984)
 
 
 [14]
 In Shipp, the Supreme Court stayed the execution of a habeas corpus petitioner pending its review of the petition. The petitioner was lynched during the operation of the stay, and Shipp, the sheriff who had had custody of the condemned man, was charged with contempt. Shipp defended the contempt action by asserting that the Court had lacked jurisdiction to stay the execution because the constitutional questions raised in the habeas petition were frivolous. Justice Holmes for the Court responded that:
 [The Court] alone necessarily had jurisdiction to decide whether the case was properly before it. On that question, at least, it was its duty to permit argument, and to take the time required for such consideration as it might need. [citation omitted]. Until its judgment declining jurisdiction should be announced, it had authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition, just as the state court was bound to refrain from further proceedings until the same time.
 203 U.S. at 573, 27 S.Ct. at 166.
 
 
 [15]
 Rather, the Baal decision in all likelihood represents no more than an application of the familiar rule that in courts should dismiss cases based on frivolous claims of jurisdiction as soon as the jurisdictional defect becomes apparent. See, e.g., Barefoot v. Estelle, 463 U.S. 880, 894, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983) (an appeal that is "frivolous and entirely without merit" is appropriately dismissed after the hearing on a motion for a stay); Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (test for immediate dismissal for want of jurisdiction is whether a claim is "wholly insubstantial and frivolous" or "patently without merit"). This interpretation of Baal is supported by the Court's statement that an "adequate basis" for a stay was "plainly lacking," from its further statement that the petitioner had not offered any "meaningful evidence" calling into question the defendant's competence, and from its citation to Barefoot v. Estelle's directive that a stay of execution will issue where there exists a substantial question about a petitioner's right to relief. See Baal, 495 U.S. at 736, 737, 110 S.Ct. at 2225, 2226
 
 
 [16]
 The district court held only a preliminary hearing to determine whether a full evidentiary hearing was required
 
 
 [17]
 The panel thus erred by denying a full evidentiary hearing in part because of its premature estimation that Mrs. Brewer's evidence was "outweighed" by the views of four state-selected experts who concluded that Brewer was competent. See Brewer, 989 F.2d at 1026 (stating that Mrs. Brewer's evidence "is insufficient to outweigh" the state's evidence); id. at 1027 (stating that recent examinations "corroborate[ ]" state's original finding of competence). While a petitioner's evidence should always be presumed true in advance of an actual evidentiary hearing in which proper credibility, determinations, weighing, and cross-examination may take place, see Card, supra, it is particularly important that courts not pre-judge psychiatric evidence. Psychiatric opinions which are not subject to cross-examination simply cannot be evaluated by a factfinder. See Ford v. Wainwright, 477 U.S. 399, 415, 106 S.Ct. 2595, 2604, 91 L.Ed.2d 335 (1986); cf. id. at 412, 106 S.Ct. at 2603 ("a particularly acute need for guarding against error" exists in competency proceedings because a competency determination "in the present state of the mental sciences is at best a hazardous guess however conscientious"). Although one of the state's experts testified at the district court preliminary hearing, petitioner's counsel was unable to cross-examine him properly because he had not been afforded an opportunity to conduct discovery regarding the basis of the expert's conclusions. See supra pp. 554-55. Nor did petitioner's counsel have the benefit of assistance from experts on an equal footing with the state's experts: in contrast to the state-selected experts, Mrs. Brewer's mental health experts were not afforded an opportunity to examine her son. See id. Finally, even if it were generally acceptable to assess the credibility and weight attributable to the opinions of psychiatric experts outside of an evidentiary hearing, the lack of an opportunity for Mrs. Brewer's experts to examine her son deprived her of a fair opportunity to gather and present such evidence. See Ford v. Wainwright, 477 U.S. at 414, 106 S.Ct. at 2604, 91 L.Ed.2d 335 (1986) (wide disagreement within psychiatric profession necessitates hearing of evidence from both parties on mental health questions); Hays v. Murphy, 663 F.2d 1004, 1011 (10th Cir.1981) (remanding for a new evidentiary hearing where "there was not sufficient opportunity for proper psychiatric and psychological evaluation" of the defendant); Smith By and Through Smith v. Armontrout, 626 F.Supp. 936, 939 (W.D.Mo.1986) (holding that an opportunity to develop evidence concerning defendant's competence is required by "rudimentary standards of due process"). For all of these reasons, it was error for the panel to rely on the opinions of the state's experts in advance of an actual evidentiary hearing